## SHOEMAKER v. UNITED STATES.

ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 1197. Argued November 28, 29, 1892. — Decided January 16, 1893.

Land taken in a city for public parks and squares by authority of law, is taken for a public use.

The extent to which such property shall be taken for such use rests wholly in legislative discretion, subject only to the restraint that just compensation must be made.

The proviso in the Maryland act of cession of the District of Columbia, that

nothing therein contained should be " so construed to vest in the United States any right of property in the soil, as to affect the right of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States," has no reference to the power of eminent domain which belongs to the United States as the grantee in the act of cession.

The United States possess full and unlimited jurisdiction, both of a political and municipal nature, over the District of Columbia.

It is within the constitutional power of Congress, in legislating for the creation of a commission charged with public duties, to provide that some members of it shall be appointed by the President, by and with the advice and consent of the Senate, and that other members of it shall consist of officers in the service of the United States, who had been appointed by the President and confirmed by the Senate, when the duties of the new office are germane to those of the offices already held by the latter.

Congress may increase the duties of an existing office without rendering it necessary that the incumbent should be again nominated, confirmed and appointed.

The approval by the President of the price to be paid by the United States for private land, condemned for public use in the exercise of the right of eminent domain, is not a judicial act.

An intention expressed by Congress not to go beyon . a sum named as the aggregate, in condemning land for a park in 'Vashington, is not a direction to appraisers to keep within any given limit in valuing any particular piece of property.

It is competent for the legislature, in providing for the cost of a public park, to · assess a proportionate part of it upon property specially benefited.

In condemning lands for a public park, it is competent for the court, in the absence of a legislative direction prescribing the form of the oath to be administered to appraisers, to direct them to take an oath to " faithfully, justly and impartially appraise the value or values of said parcels of land, and of the respective interests therein, to the best of their skill and judgment."

In determining the values of lands so taken appraisers should exercise their own judgment, derived from personal knowledge and inspection of the lands, as well as their knowledge derived from the evidence adduced by the parties.

An appellate court will not interfere with the report of commissioners, (or appraisers,) in such case, to correct the amounts reported, except in case of gross error showing prejudice, corruption or plain mistake.

If there were any deposits of gold in the land condemned for the Rock Creek Park in Washington, those deposits were the property of the United States.

The filing of a map of the land proposed to be taken for the Rock Creek Park, made under § 3 of the act of September 27, 1890, 26 Stat. 492, c.

· 1001, was not a finalty, and did not commit the commissioners to taking
all the tracts included in it.

The owners of the tracts condemned for that park are not entitled to inter-
est upon the respective sums assessed as damages for the taking.

UNDER the title of "An act authorizing the establishing of a
public park in the District of Columbia," an act of Congress
was approved on September 27, 1890, 26 Stat. 492, c. 1001,
directing that a tract of land lying on both sides of Rock
Creek, and within certain limits named in the act, be secured
as thereinafter set out, and be perpetually dedicated and set
apart as a public park or pleasure ground for the benefit and
enjoyment of the people of the United States. The act pro-
vided that the whole tract to be selected and condemned should
not exceed two thousand acres, and that the cost thereof
should not be in excess of a certain amount appropriated.

It was provided that the Chief of Engineers of the United
States Army, the Engineer Commissioner of the District of
Columbia, and three citizens to be appointed by the President,
by and with the advice and consent of the Senate, be, and they
were by the act, created a commission (a majority of which
should have power always to act) to select the land for the
said park, of the quantity and within the limits prescribed,
and to have the same surveyed by the assistant to the said
Engineer Commissioner of the District of Columbia in charge
of public highways.

The means to be employed in the ascertainment of the value
of the lands to be selected, and in the acquirement of owner-
ship and possession thereof by the United States, were provided
for in sections 3, 4 and 5 of the act, which were as follows:

"SEC. 3. That the said commission shall cause to be made
an accurate map of said Rock Creek Park, showing the loca-
tion, quantity and character of each parcel of private property
to be taken for such purpose, with the names of the respective
owners inscribed thereon, which map shall be filed and re-
corded in the public records of the District of Columbia, and
from and after the date of filing said map the several tracts
and parcels of land embraced in said Rock Creek Park shall
be held as condemned for public uses, and the title thereof

vested in the United-States, subject to the payment of just compensation, to be determined by said commission, and approved by the President of the United States: *Provided*, That such compensation be accepted by the owner or owners of the several parcels of land.

"That if the said commission shall be unable by agreement with the respective owners to purchase all of the land so selected and condemned within thirty days after such condemnation, at the price approved by the President of the United States, it shall, at the expiration of such period of thirty days, make application to the Supreme Court of the District of Columbia, by petition, at a general or special term, for an assessment of the value of such land as it has been unable to purchase.

"Said petition shall contain a particular description of the property selected and condemned with the name of the owner or owners thereof, if known, and their residences, so far as the same may be ascertained, together with a copy of the recorded map of the park; and the said court is hereby authorized and required, upon such application, without delay, to notify the owners and occupants of the land, if known, by personal service, and if unknown, by service by publication, and to ascertain and assess the value of the land so selected and condemned, by appointing three competent and disinterested commissioners to appraise the value or values thereof, and to return the appraisement to the court; and when the value or values of such land are thus ascertained, and the President of the United States shall decide the same to be reasonable, said value or values shall be paid to the owner or owners, and the United States shall be deemed to have a valid title to said land; and if in any case the owner or owners of any portion of said land shall refuse or neglect, after the appraisement of the cash value of said lands and improvements, to demand or receive the same from said court, upon depositing the appraised value in said court to the credit of such owner or owners, respectively, the fee-simple shall in like manner be vested in the United States.

"SEC. 4. That said court may direct the time and manner in which the possession of the property condemned shall be

taken or delivered, and may, if necessary, enforce any order or issue any process for giving possession.

"SEC. 5. That no delay in making an assessment of compensation, or in taking possession, shall be occasioned by any doubt which may arise as to the ownership of the property, or any part thereof, or as to the interests of the respective owners. In such cases the court shall require a deposit of the money allowed as compensation for the whole property or the part in dispute. In all cases as soon as the said commission shall have paid the compensation assessed, or secured its payment by a deposit of money under the order of the court, possession of the property may be taken. All proceedings hereunder shall be in the name of the United States of America and managed by the commission."

It was made the further duty of the commission, when they had ascertained the amount required to be paid for the land, and for expenses, to assess the same upon the lands, lots and blocks, situated in said District, specially benefited by reason of the location and improvement of said park, in proportion to such benefits to said property; and it was provided that if the commission should find that the benefits were not equal to the cost and expenses of the land obtained for the park, they should assess each tract specially benefited to the extent of the benefit thereto. If the proceeds of the assessment exceeded the cost of the park, the excess was to be used in its improvement, if such excess should not exceed the amount of ten thousand dollars ; any part above that amount to be refunded ratably. The commission was to give due notice of the time and place of their meeting for the purpose of making such assessment for benefits, and all persons interested might appear and be heard. This assessment being duly made, it became the duty of the commission to apply to the Supreme Court of the District of Columbia to have it confirmed. The court was given power, after notice duly given to all parties in interest, to hear and determine all matters connected with said assessment, and to revise, correct, amend and confirm the same, in whole or in part, or order a new assessment in whole or in part, with or without further notice, or on such

notice as it should prescribe. The act also prescribed the mode in which payment of the assessment for benefits should be made after it was confirmed, and provided for the enforcement of such payment in the manner employed in the District for the collection of delinquent taxes. All payments under said assessment were to be made to the Treasurer of the United States, and all money so collected might be paid by the Treasurer, on the order of the commission, to any persons entitled thereto as compensation for land or services.

To pay the expenses of inquiry, survey, assessment, cost of lands taken, and all other expenses incidental thereto, the sum of $1,200,000 was appropriated out of any money in the Treasury not otherwise appropriated, one-half of which, as well as one-half of any sum annually appropriated and expended for the maintenance and improvement of the park, was made a charge upon the revenues of the District of Columbia.

The act finally provided that the public park authorized and established thereby should be under the joint control of the Commissioners of said District and the Chief of Engineers of the United States Army, and it was made their duty, as soon as practicable, to render the park fit for the purposes of its establishment, and to make and publish such regulations, as they deemed necessary or proper for the care and management of the same.

On May 20, 1891, the commission appointed under the provisions of the act filed a petition in the Supreme Court, of the District of Columbia, setting out therein that they had caused a map to be made of the lands selected by them for the park, showing the location, quantity and character of each tract or parcel of property to be taken therefor, and that they had filed and recorded the map in the public records of said District on April 16, 1891. The petitioners stated that immediately upon the filing of the map they made to each of the owners of said tracts of land an offer to purchase his property at a definite sum fixed by the commission and approved by the President of the United States, and that they had not been able within the time limited for such pur-

pose to purchase, by agreement with the owners, any of the lands, except five of the eighty-four tracts selected; and the petitioners therefore prayed the court for the appointment of three competent and disinterested commissioners to appraise the land so selected, and to return the appraisement to the court. The court directed that the petition be filed in general term, and ordered that the persons named as respondents to the petition, and all others interested or claiming to be interested in the land described, or in any part thereof, as occupants or otherwise, appear in court on or before June 15, 1891, and show cause why the prayer of the petition should not be granted, and why the court should not proceed at that time as directed by the act of Congress. The court further directed that a copy of this order be served upon such of the named respondents as should be found in said District at least seven days before June 15, 1891, and that a copy thereof be duly published in the periodical press of the District.

After the petition was filed, Pierce Shoemaker, one of the respondents thereto, died, and his death being suggested to the court, Louis P. Shoemaker, Francis D. Shoemaker, Abigail C. Newman, and Clara A. Newman, heirs at law and devisees of the said Pierce Shoemaker, deceased, were, on June 2, 1891, made parties respondent in his place and stead.

The said Louis P. Shoemaker and Francis D. Shoemaker, executors of the last will and testament of the said Pierce Shoemaker, deceased, appeared in court June 15, 1891, and moved that the petition be dismissed. This motion was based upon various grounds, each one of which impeached the constitutionality of the said act, and the validity of proceedings under it. These grounds were, in substance, that two members of the commission were appointed by Congress, and not by any executive officer or court; that the act provided that the President should perform a judicial function in participating in the appraisement of the several tracts of lands to be selected for the park, and in adjudicating upon awards respecting the same; that the approval or disapproval of the said appraisement was left to the President, who was virtually a party to the condemnation proceedings, and not left to an

impartial judicial tribunal to decide upon the question of just compensation for the property; that the amount to be paid for the property was limited to a fixed sum, regardless of its adequacy as just compensation therefor; that Congress by the act attempted to exercise the right of eminent domain within the District of Columbia for purposes foreign to the needs and requirements of its exclusive power therein; and that such exercise was in violation of its compact made with the State of Maryland upon the cession of territory thereof to the United States, that nothing contained in the act of cession, passed by the assembly of Maryland, should " be so construed to vest in the United States any right of property in the soil, as to affect the right of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States."

This motion was denied, the court being of opinion that it was not unconstitutional for the legislature to entrust the performance of particular duties to officials already charged with duties of the same general description, and that, besides, as the majority of the commission was empowered by the law to act in all cases, the three civilian members might legally discharge the duties of the commission, independently of the two army officers, if the appointment of the latter was irregular; that no judicial power was devolved upon the President by the act, he being only vested with authority either to acquiesce in the judgment of the assessors or to decline on behalf of the United States to accept the property, and having no power to take the property in disregard of their assessment; that the limitation by the act of the amount to be paid for said lands was not unconstitutional, as the appraisers were bound, as competent and disinterested commissioners, to return what they believed was the just value of the properties, regardless of any restriction in the act as to the cost thereof; that the condemnation of land for a public park was a taking of property for public uses within the meaning of the Constitution; that no relinquishment of the Federal power of eminent domain could be deduced from the legislation relating to the acquisition of said territory from the State of Maryland

by the United States; and that the United States could not have bound itself by any such condition, even though distinctly set forth in the act of cession. 19 Wash. Law Rep. 466.

The said respondents thereupon asked leave to file a demurrer to the petition. This being refused, they prayed in open court the allowance of a writ of error, returnable to this court, to review the judgment of the general term overruling the motion to dismiss the petition. This application was denied because that judgment was interlocutory. Application was then made to one of the justices of this court, and he denied it.

The court of the District of Columbia then made an order appointing three citizens of the District, whom it adjudged to be competent and disinterested, to appraise the values of the land selected for the park, with directions to return the appraisement into court, and to perform all other duties imposed upon them by the act of Congress.

The said respondents, who are the present plaintiffs in error, then presented to the court of the District a form of oath which they prayed might be administered to said appraisers, and also certain instructions which they prayed the court to give them. The court refused to administer the oath and to give the instructions proposed by plaintiffs in error, and a different oath was administered and different instructions given to said appraisers by the court. Exceptions to this action of the court were filed by plaintiffs in error, August 1, 1891.

The said appraisers entered upon the discharge of their duties. At the hearing before them evidence was offered by the plaintiffs in error for the purpose of sustaining certain allegations of the existence of gold in paying quantities in the tract of land shown on the map as tract No. 39. This evidence having been received by the appraisers, the United States moved the court strike it from the record. This motion was sustained, and the appraisers were directed not to consider that evidence in making up their award. The court held that if any deposits of gold existed in said land they were the

property of the United States; that the State of Maryland was the owner of all mines of gold or other precious minerals within its borders, by virtue of its confiscation of the property of the lord proprietary in 1780, who had never parted with his title, held under his charter from Charles I, to such mines; and that the legislature of the State of Maryland, by its act of cession, transferred its interest in any possible gold mines in the ceded territory to the United States. During the argument upon that motion the plaintiffs in error showed the court that in a resurvey patent granted by the State of Maryland in 1803, under which the plaintiffs in error mediately claim title, there was no reservation of mines, and contended that, as this patent was based upon a warrant of resurvey dated May 12, 1800, nine months before Congress assumed jurisdiction in the District of Columbia, the grantee under it acquired an equitable title to the land patented by virtue of that warrant. The court held that under the law of Maryland no equitable title could be created until the return of the certificate of survey to the land office; and that, as the patent did not show that such certificate was returned to the office, and as the party obtaining the warrant had, under the law, two years in which to have the certificate returned, the presumption would be that it was not returned until after 1801, and that, therefore, the grantee could take no title whatever under the patent until its issue in 1803. And further, that the State of Maryland could grant no title to lands within the ceded territory after the act of cession in 1791; and that the proviso therein with reference to the continuance of the jurisdiction of the laws of Maryland over persons and property in the ceded territory, until Congress should provide for the government thereof, applied only to laws affecting private rights, and did not continue the operation of the land laws of Maryland as to public lands owned by the State within that territory.

The plaintiffs in error then applied to the appraisers, in November, 1891, for permission to offer newly discovered evidence, relating to the ownership of the alleged gold deposits, to the end that they might move the court in general term,

upon the strength of such evidence, to rescind the order directing the appraisers to strike out of the record the evidence relating to the existence of gold in the property, and requested the appraisers to submit their application to the court in general term for further instructions. This application was submitted to the court, and the plaintiffs in error, on December 4, 1891, moved that the appraisers be instructed to receive the additional evidence touching the ownership of the alleged gold deposits in said tract No. 39, which motion was overruled. The new evidence tended to show that certain lands, which the court had held to be subject to a reservation of "royal mines" in a patent granted by the lord proprietary in 1772, were covered in part by a patent granted by him in 1760, which did not contain such reservation. The plaintiffs in error therefore contended that, though the patent of 1772 was original as to part of the lands described therein, it was, with reference to the lands granted in 1760, which lands included the said tract No. 39, a patent of confirmation only, and, as such, did not create a new estate, but simply recognized or reaffirmed the former one. The new evidence further tended to show that the grantee under those patents conveyed his estate to two persons as tenants in common; that the estate of one of those persons was confiscated as property of a British subject, and was afterwards, in 1792, conveyed by the State to the mediate grantor of the plaintiffs in error, without any reservation of said mines. The court was of opinion that the acceptance of a new grant from the lord proprietary, such as that described, necessarily involved the surrender of the original title, and therefore the patent of 1772 was original as to all the land it purported to grant or confirm; and that the conveyance made by the State in 1792 did not purport to convey anything else than the property confiscated, which was held subject to the reservation aforesaid; and that such conveyance made after 1791 could not be operative.

On December 19, 1891, the appraisers submitted their report and a copy of the proceedings before them, to the court, and the court ordered that the report, together with the testimony and exhibits, be filed.

The plaintiffs in error filed their exceptions to this report January 4, 1892, said exceptions being based upon the grounds, among others, that the act of Congress was unconstitutional and all proceedings based thereon void; that the aggregate of the values, found by the assessors, of the lands included in the park, was in excess of the appropriation made by Congress; that the actual values of the lands were largely in excess of the values fixed by the appraisers; that the commissioners, in appraising the values of the property, disregarded certain parts of the evidence in respect thereto; that the attorney representing the government did not produce witnesses to impartially testify touching the value of said lands, but, on the contrary, placed a list of prices fixed by said park commission in the hands of divers persons proposed to be used as witnesses, for the purpose of affecting their judgment as to values, and to guide them in reaching values to correspond with those thus furnished them.

The plaintiffs in error contended that into the present act should be read the sundry civil appropriation act of August, 1890, wherein it was provided that the valuation by appraisers, to be appointed by the court, of lands to be purchased for the Government Printing Office, should be confirmed by the court, said appropriation act providing that after its pasisge, in all cases of the taking of property in said District for public uses, its provisions respecting such condemnation and appraisement should operate; and contended that under said appropriation act the court should review the evidence and proceedings before the appraisers appointed in the present instance, and decide whether the values fixed by them afforded just compensation for the property taken.

These exceptions were overruled, and the report confirmed. The constitutional questions involved having been already passed upon, the court decided, in overruling said exceptions, that the restriction in the act as to the cost of the lands is not a restriction upon the duty of the court to confirm the appraisement, but a restriction upon the government's finally securing the land, since it cannot be discovered whether or not the value is in excess of the appropriation until the court has dis-

charged its duty of assessing the land; that, as the evidence before the appraisers was conflicting, and the result simply an estimate based upon a comparison of the opposing opinions of witnesses, it cannot be said that the verdict was contrary to the evidence; that, as to the objection that lists of values fixed by the park commission were furnished to witnesses, an expert witness has a right to qualify himself by comparing his views with those of others, and to enlighten his judgment by any means which conduce to the formation of a reliable opinion, as after all he simply gives an opinion; that, as a general rule, the court has no right to review an appraisement simply because of error of judgment, if such has been manifested, on the part of the appraisers, as to value, and the said sundry civil appropriations act did not modify the rule; and that, under said appropriations act, the court must confirm the appraisement as a matter of course if the appraisers had discharged their duty, and if there were no legal ground for setting their report aside.

The park commission, in consideration of the limitation in the act with respect to the amount to be paid for the lands, and the difficulties resulting from an appraisement of values which, when added to the amount paid for tracts purchased and for expenses, would exceed the appropriation, on March 11, 1892, submitted for the inspection of the President a copy of the map, showing by red lines thereon the boundaries of a reduced area within the limits of the lands first selected, formed by the omission of certain tracts originally included. A letter of the park commission anticipating these difficulties had been referred to the Attorney General, and in his opinion thereon, dated April 10, 1891, he stated that if the assessed value of the land in the court proceedings exceeded the appropriation, the commission might exercise its discretion to pay for the land they regarded as most desirable.

In conformity with this interpretation of the act, the park commission reduced the area of the land proposed to be taken, to within the limits indicated by red lines on the said map, and, having shown to the President the cost of the lands within the reduced area, together with all expenses, requested him to decide the values appraised to be reasonable. In

response to this, by his letter to the park commission, dated April 13, 1892, the President stated his decision that the values fixed by the appraisers appointed by the Supreme Court of said District under the act were reasonable.

The park commission then filed a petition in said court, April 19, 1892, presenting the decision of the President, and showing that each and all the owners of said parcels, the assessed values of which had been so decided to be reasonable, had failed and neglected to demand or receive from the court those values, and that said owners claimed interest on their respective assessments from the date of the filing of the said original map. The petitioners therefore prayed the court to pass an order authorizing them to pay into court the assessed values of all of said parcels of real estate.

On May 2, 1892, the said respondents, now plaintiffs in error, moved to dismiss the petition on the grounds, among others, that the assessment of only a part of the lands shown on the map as originally prepared had been acted upon by the President; that no proceedings had been instituted on the basis of the reduced area, nor any map filed other than the original map; that the park commission having selected lands for the park, and filed a map thereof, had no power to reduce the area of the lands; and that for about a half mile along said Rock Creek, lands taken for the park lie upon only one side thereof, whereas said act provides that the park is to lie on both sides of said creek.

The court denied the motion, interpreting the act to express an absolute intent that there shall be a park on Rock Creek, and to give authority to the park commission, after making their original selection of lands for the park, to amend their work by abandoning such parcels as they were not authorized by the appropriation to purchase. The operation of the order denying this motion was suspended, however, so far as it might affect the property of the plaintiffs in error, until the further order of the court.

The plaintiffs in error then presented to the court an answer to the petition, setting up the same grounds of objection thereto as urged by them in their motion to dismiss the

last-named petition, and requested that the answer might be filed. The court finding no point presented in the answer not already passed upon, denied the request to have the same filed, and ordered May 24, 1892, that the United States pay forthwith into the registry of the court the values, without interest thereon, appraised by the appraising commissioners theretofore appointed by the court, including the values of the property of plaintiffs in error.

Upon motion of the park commission, the court, on July 13, 1892, granted an order to show cause why the title in fee simple to the property of plaintiffs in error should not be declared by the court to be vested in the United States. The plaintiffs in error filed an answer to this rule, reserving therein all the objections theretofore taken by them during the progress of the said proceedings. The court overruled the objections, and ordered and decreed, July 16, 1892, that the fee simple title to each and all of the tracts of land represented by plaintiffs in error be vested in the United States, and that the owners of said tracts forthwith deliver up possession of their respective holdings to the park commission or its executive officer. On July 19, 1892, upon application of the United States, a special auditor was appointed to ascertain and report to the court the names of the persons respectively entitled to the appraised values of the tracts of lands selected for said park, claimed by the plaintiffs in error, and to report separately upon each tract or road within the boundaries thereof.

Thereupon plaintiffs in error sued out a writ of error to bring this final judgment and the record in the condemnation proceedings before this court for review.

In addition to the alleged errors above indicated, the plaintiffs in error now say, first, that the United States had no right, after filing the first map of the land selected, to abandon the taking of any part of the land condemned; and, secondly, that the assessment for benefits provided for by the act of Congress is beyond the power of the government, and that, therefore, the act is void.

*Mr. Tallmadge A. Lambert* and *Mr. Jeremiah M. Wilson* for plaintiffs in error.

*Mr. R. Ross Perry* and *Mr. C. C. Cole,* (with whom was *Mr. H. T. Taggart* on the brief,) for defendants in error.

MR. JUSTICE SHIRAS, after stating the case as above, delivered the opinion of the court.

In the memory of men now living, a proposition to take private property, without the consent of its owner, for a public park, and to assess a proportionate part of the cost upon real estate benefited thereby, would have been regarded as a novel exercise of legislative power.

It is true that, in the case of many of the older cities and towns, there were commons or public grounds, but the purpose of these was not to provide places for exercise and recreation, but places on which the owners of domestic animals might pasture them in common, and they were generally laid out as part of the original plan of the town or city.

It is said, in Johnson's Cyclopædia, that the Central Park of New York was the first place deliberately provided for the inhabitants of any city or town in the United States for exclusive use as a pleasure-ground, for rest and exercise in the open air. However that may be, there is now scarcely a city of any considerable size in the entire country that does not have, or has not projected, such parks.

The validity of the legislative acts erecting such parks, and providing for their cost, has been uniformly upheld. It will be sufficient to cite a few of the cases. *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234; *In re Commissioners of the Central Park,* 63 Barb. 282; *Owners of Ground* v. *Mayor of Albany,* 15 Wend. 374; *Holt* v. *Somerville,* 127 Mass. 408; *Foster* v. *Boston Park Commissioners,* 131 Mass. 225; also 133 Mass. 321; *St. Louis County Court* v. *Griswold,* 58 Missouri, 175; *Cook* v. *South Park Commissioners,* 61 Illinois, 115; *Kerr* v. *South Park Commissioners,* 117 U. S. 379. In these and many other cases it was, either directly or in effect, held that land taken in a city for public parks and squares, by authority of law, whether advantageous to the public for recreation, health or business, is taken for a public use.

In the case cited from the Missouri Reports, where the legislature had authorized the appropriation of land for a public park for the benefit of the inhabitants of St. Louis County, situated in the eastern portion of the county, near to and outside of the corporate limits of the city of St. Louis, it was held that this was a public use, notwithstanding the fact that it would be chiefly beneficial to the inhabitants of the city, and that the act was not unconstitutional.

The adjudicated cases likewise establish the proposition that while the courts have power to determine whether the use for which private property is authorized by the legislature to be taken, is in fact a public use, yet, if this question is decided in the affirmative, the judicial function is exhausted; that the extent to which such property shall be taken for such use rests wholly in the legislative discretion, subject only to the restraint that just compensation must be made.

A distinction, however, is attempted in behalf of the plaintiffs in error between the constitutional powers of a State and those of the United States, in respect to the exercise of the power of eminent domain, and this distinction is supposed to be found in a restriction of such power in the United States to purposes of political administration; that it must be limited in its exercise to such objects as fall within the delegated and expressed enumerated powers conferred by the Constitution upon the United States, such as are exemplified by the case of post-offices, custom-houses, court-houses, forts, dockyards, etc.

We are not called upon, by the duties of this investigation, to consider whether the alleged restriction on the power of eminent domain in the general government, when exercised within the territory of a State, does really exist, or the extent of such restriction, for we are here dealing with an exercise of the power within the District of Columbia, over whose territory the United States possess, not merely the political authority that belongs to them as respects the States of the Union, but likewise the power "*to exercise exclusive legislation in all cases whatsoever over such District.*" Constitution Art. I, Sec. 8, par. 17. . It is contended that, notwithstanding this apparently unlimited grant of power over

the District, conferred in the Constitution itself, there was a limitation on the legislative power of the general government contained in the so-called act of cession by the State of Maryland, (Act of 1791, c. 45, § 2,) a proviso to which is in the words following : " Provided, that nothing herein contained shall be so construed to vest in the United States any right of property in the soil, as to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States." It is said that the acceptance by the United States of the grant constituted a contract between Maryland and the United States, whereby, in view of the foregoing language, the land owner was to be protected against any exercise by the general government of the sovereign power of eminent domain. It is sufficient to say that the history of the transaction clearly shows that the language used in the Maryland act referred to such persons as had not joined in the execution of a certain agreement by which the principal proprietors of the Maryland portion of the territory undertook to convey lands for the use of the new city, and their individual rights were thus thought to be secured. The provision had no reference to the power of eminent domain, which belonged to the United States as the grantee in the act of cession.

This position, contended for by the plaintiffs in error, was raised in the case of *Chesapeake & Ohio Canal* v. *Union Bank*, in the Circuit Court of the United States for the District of Columbia, and Cranch, C. J., said: " The eighth objection is that by the Maryland act of cession to the United States, of this part of the District of Columbia, (1791, c. 45, sec. 2,) Congress are restrained from affecting the rights of individuals to the soil, otherwise than as the same should be transferred to the United States by such individuals ; and it is contended that this prohibits the United States from taking private property in this District for public use, and that the right of sovereignty, which Maryland exercised, was not transferred. We think it is a sufficient answer to this objection to say that the United States do not, by this inquisition or by the charter to the Chesapeake & Ohio Canal Company,

claim any right of property in the soil. They only claim to exercise the power which belongs to every sovereign, to appropriate, upon just compensation, private property to the making of a highway, whenever the public good requires it." 4 Cranch, C. C. 75, 80.

But this contention can scarcely have been seriously made in view of the explicit language of the Maryland act in its second section: "That all that part of said territory called Columbia, which lies within the limits of this State, shall be, and the same is hereby, acknowledged to be forever ceded and relinquished to the Congress and government of the United States, in full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon, pursuant to the tenor and effect of the eighth section of the first article of the Constitution of government of the United States." *Mattingly* v. *District of Columbia*, 97 U. S. 687, 690; *Gibbons* v. *District of Columbia*, 116 U. S. 404.

Proceeding upon the conclusion that the United States possess full and unlimited jurisdiction, both of a political and municipal nature, over the District of Columbia, we come to a consideration of certain objections, taken in the court below and urged here, to the validity of the statute itself and to the proceedings under it.

There are several features that are pointed to as invalidating the act. The first is found in the provision appointing two members of the park commission, and the argument is, that while Congress may create an office, it cannot appoint the officer; that the officer can only be appointed by the President with the approval of the Senate, and that the act itself defines these park commissioners to be public officers, because it prescribes that three of them are to be civilians, to be nominated by the President and confirmed by the Senate. This, it is said, is equivalent to a declaration by Congress that the three so sent to the Senate are "officers," because the Constitution provides only for the nomination of "officers" to be sent to the Senate for confirmation; and that it hence follows that the other two are likewise "officers," whose appointment should have been made by the President and confirmed by

the Senate.   As, however, the two persons whose eligibility is questioned were at the time of the passage of the act and of their action under it officers of the United States who had been theretofore appointed by the President and confirmed by the Senate, we do not think that, because additional duties, germane to the offices already held by them, were devolved upon them by the act, it was necessary that they should be again appointed by the President and confirmed by the Senate.   It cannot be doubted, and it has frequently been the case, that Congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed.

It is true that it may be sometimes difficult to say whether a given duty, devolved by statute upon a named officer, has regard to the civil or military service of the United States. *Wales* v. *Whitney*, 114 U. S. 564, 569; *Smith* v. *Whitney*, 116 U. S. 167, 179, 181.   But, in the present case, the duty which the military officers in question were called upon to perform cannot fairly be said to have been dissimilar to, or outside of, the sphere of, their official duties.

The second objection made to the validity of the act is because of certain functions to be performed by the President, which the objection characterizes as judicial, and hence beyond his legal powers, and as incompatible with his official duties. The duties prescribed to the President are the appointment of members of the park commission, the approval of the price to be given for lands where an agreement has been had between the owners and the commission, and, if an agreement is not made, and a value is put upon lands by appraisers appointed under the act, the decision whether such value is reasonable. The appointment of the commission is plainly an executive duty, and the approval of the value or price, whether fixed by agreement or appraisal, cannot be said to be a judicial act. What the President decides is not whether the value is reasonable as respects the property owner, but reasonable as regards the United States.   Similar provisions were contained in the act of June 25, 1890, c. 613, 26 Stat. 174, condemning land for a city post-office, and in the act of August 30, 1890, 26

OCTOBER TERM, 1892.

Stat. 371, 412, c. 837, §§ 2, 3, authorizing the acquisition of land for the use of the Government Printing Office. The President has nothing to do with fixing the price; but, after that has been done, by agreement or by appraisers, he must decide whether the United States will take the land upon such terms, or, in other words, whether such value is reasonable.

The validity of the law is further challenged because the aggregate amount to be expended in the purchase of land for the park is limited to the amount of $1,200,000. It is said that this is equivalent to condemning the lands and fixing their value by arbitrary enactment. But a glance at the act shows that the property holders are not affected by the limitation. The value of the lands is to be agreed upon, or in the absence of agreement, is to be found by appraisers to be appointed by the court. The intention expressed by Congress, not to go beyond a certain aggregate expenditure, cannot be deemed a direction to the appraisers to keep within any given limit in valuing any particular piece of property. It is not unusual for Congress, in making appropriations for the erection of public buildings, including the purchase of sites, to name a sum beyond which expenditure shall not be made, but nobody ever thought that such a limitation had anything to do with what the owners of property should have a right to receive in case proceedings to condemn had to be resorted to.

A further objection is made to the validity of the act by reason of the sixth section, which provides for the assessment of benefits resulting from "the location and improvement of said park" upon lands so especially benefited.

The cases heretofore cited to show that the erection of parks in cities is a public use, in a constitutional sense, were, most of them, cases in which it was likewise held that it is competent for the legislature, in providing for the cost of such parks, to assess a proportionate part of the cost upon property specially benefited; and we need not repeat the citations.

No special request, on the subject of the legal effect of the provision in respect to special benefits, seems to have been made to the court below, and there is no specific assignment of error as to it. Nor does it appear that any person having

property actually assessed for special benefits is a party as plaintiff in error. We are therefore relieved from any extended consideration of· this feature of the act.

Certain questions arose during the trial of the case below which are brought to our attention by bills of exception. One of these was as to the form of the oath administered to the appraisers. The defendants asked the court to administer an oath to " appraise the value of the respective interests of all persons concerned in the land within the Rock Creek Park upon the whole evidence, guided by the rules of, law as furnished by this court." This the court declined to do, and prescribed an oath to " faithfully, justly and impartially appraise the value or values of said parcels of land and of the respective interests therein to the best of their skill and judgment."

As the statute did not prescribe any form for the oath, we do not perceive that the court exercised its discretion wrongfully in prescribing the form of oath that was used. The purpose of the defendants, in asking for the imposition of an oath in the form presented by them, would appear to have been to restrain the appraisers from being influenced by their own inspection of the lands, and to restrict them to the evidence or estimates that should be adduced before them. Whether this be so or not, the oath actually administered did not, as we understand it, leave the appraisers " at liberty at their discretion to disregard the evidence altogether and to make their appraisement without regard to the evidence," but their duty was to view the lands, hear the evidence, and fix the values.

Complaint is made, in another exception, of instructions given and refused by the court in instructing the commission. We shall briefly consider this objection. The instruction given was as follows: " The commissioners are instructed that they shall receive no evidence tending to prove the prices actually paid on sales of property similar to that included in said park, and so situated as to adjoin it or to be within its immediate vicinity, when such sales have taken place since the passage of the act of Congress of the 27th of September, 1890, authorizing said park, but any recent *bona fide* sales made before the passage of said act, of lots similarly situated and adapted to

similar uses, or recent *bona fide* contracts made before the passage of said act, with land owners, for other lands in the vicinity similarly situated, may be considered by the commissioners, looking at all the circumstances of these sales or contracts in the determination of the ultimate question of value."

A further instruction was given in the following terms: "The commissioners are further instructed that they shall be governed in their inquiry in making their valuations by the following considerations: What are the lands within the park limits now worth in cash, or in terms equivalent to cash, in the market, if a market now exists for such lands? What would any one needing lands for residence, agriculture or any other purpose pay for them in cash? They are not at liberty to place a value upon these lands upon the basis of what one might be willing to buy them on time for purely speculative purposes, nor can they consider the value given them by the establishing the park, and they are to make their valuation without consideration of the fact that a specific amount of money is appropriated by the act of Congress of 27th September, 1890."

The instructions asked for by the plaintiffs in error were as follows: "The commissioners shall estimate each parcel of land at its market value, and are instructed that the market value of the land includes its value for any use to which it may be put, and all the uses to which it is adapted, and not merely the condition in which it is at the present time, and the use to which it is now applied by the owner; . . . that if, by reason of its location, its surroundings, its natural advantages, its artificial improvement or its intrinsic character, it is peculiarly adapted to some particular use — *e.g.*, to the use of a public park — all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation."

The theory of appraisement asked for by the plaintiffs in error differed from the one adopted by the court chiefly in two particulars — first, it treats the case as if it were one before an ordinary jury, whose action is determined by the evidence adduced; and, second, that the evidence might have

reference to and include any supposed or speculative value given to the property taken by reason of the act of Congress creating the park project: whereas the court regarded the functions of the appraisers as including their own judgment and inspection of the lands taken as well as a consideration of the evidence adduced by the parties.

We approve of the instructions given by the court in both of these particulars.

The scope of action of the board of commissioners was plainly, by the terms of the act and the nature of the inquiry, not restricted to a mere consideration of the evidence and allegations of the parties, but included the exercise of those powers of judgment and observation which led to their selection as fit persons for such a position.

While the board should be allowed a wide field in which to extend their investigation, yet it has never been held that they can go outside of the immediate duty before them, viz., to appraise the tracts of land proposed to be taken, by receiving evidence of conjectural or speculative values, based upon the anticipated effect of the proceedings under which the condemnation is had. *Kerr* v. *South Park Commissioners,* 117 U. S. 379, 380.

In connection with this part of the subject, we may appropriately consider the objection made to the action of the court below in declining to review and pass upon the evidence that had been produced before the commissioners.

If, as we have said, the court below was right in refusing to restrict the commissioners to a mere consideration of the evidence adduced, then it would seem to follow that the court could not be legitimately asked, in the absence of any exceptions based upon charges of fraud, corruption or plain mistake on the part of the appraisers, to go into a consideration of the evidence. The court cannot bring into review before it the various sources and grounds of judgment upon which the appraisers have proceeded. The attempt to do so would transfer the function of finding the values of the lands from the appraisers to the court. Such a course would have presented a much more serious allegation of error than we find in the objection as made.

The rule on this subject is so well settled that we shall content ourselves with repeating an apt quotation from Mills on Eminent Domain, 246, made in the opinion of the court below: "An appellate court will not interfere with the report of commissioners to correct the amount of damages except in cases of gross error, showing prejudice or corruption. The commissioners hear the evidence and frequently make their principal evidence out of a view of the premises, and this evidence cannot be carried up so as to correct the report as being against the weight of evidence. Hence, for an error in the judgment of commissioners in arriving at the amount of damages there can be no correction, especially where the evidence is conflicting. Commissioners are not bound by the opinions of experts or by the apparent weight of evidence, but may give their own conclusions."

A number of exceptions were filed to the action and conduct of the commissioners, but we think that they raised questions covered by the observations already made, and were properly disposed of by the court below.

Whether the plaintiffs in error were entitled to be allowed, in the assessment of damages, for the value of prospective gold mines in tract 39 designated on the map of the park, was a question mooted at the trial, and the action of the court, in striking out the testimony offered to show such value, and in holding that, if there are any deposits of gold in this ground, they are the property of the United States, is complained of in the 7th, 8th and 9th assignments of errors. The history of the tract in question was gone into at great length, and various patents of the Province and State of Maryland were put in evidence. The court below held that, as by the grant of Charles I to Lord Baltimore, "all veins, mines and quarries, as well opened as hidden, already found, or that shall be found within the regions, islands or limits aforesaid, of gold, silver, gems and precious stones," passed to the grantee, he yielding unto the king, his heirs and successors, "the one-fifth part of all gold and silver ore which shall happen from time to time to be found;" and as the confiscation of the proprietary's title in 1780 vested the same in the State of Mary-

land, and as also the royalty of one-fifth part of the gold and silver reserved to the king had also become, by the Revolution, vested in the State, consequently the United States succeeded to the State's title by the act of cession of 1791.

The discussion by the court below was so elaborate and careful that no useful purpose would be served by entering minutely into the subject in this opinion. It is sufficient to say that our examination of the evidence contained in the record fails to disclose any error in the ruling of the court below, respecting the ownership of a supposed gold mine in tract 39, and we adopt its opinion[1] as presenting a full and satisfactory treatment of the question.

---

[1] The opinion thus adopted by this court will be found in the record, pages 168 to 175, and 212 to 218, and is as follows:

By Mr. Justice Cox:

We have had under consideration the motion made in this matter by the petitioners, and that motion is that the court strike out all the evidence introduced by the defendants Shoemaker and Truesdell relating to the existence of gold mines in tracts 39 and 42 on the map filed by said petitioners, on the ground that if any gold mines exist therein the title thereto is in the United States.

In order to solve this question we are compelled to go somewhat into the history of titles in Maryland. All land titles in the District are derived primarily from Maryland. We all know that the history of the title to real estate in Maryland commenced with the charter to Caecilius Calvert, Lord Baltimore, by Charles I, in the 8th year of his reign. That charter defines the limits of the province of Maryland and grants and confirms unto the said Caecilius Calvert, baron of Baltimore, his heirs and assigns, the lands and waters included within those limits, and goes on to say: "And moreover all veins, mines and quarries, as well opened as hidden, already found or that shall be found within the region, islands or limits aforesaid of gold, silver, gems and precious stones, and any other whatsoever, whether they be of stones or metals or of any other thing or matter whatsoever." They were granted to him, his heirs and assigns, forever, " to hold of us, our heirs and successors, kings of England as of our castle of Windsor, in our county of Berks, in free and common soccage, by fealty only for all services, and not *in capite* knight's service, yielding therefor unto us, our heirs and successors, two Indian arrows of those parts to be delivered at the said castle of Windsor every year, on Tuesday in Easter week, and also the fifth part of all gold and silver ore, which shall happen from time to time to be found within the aforesaid limits."

The twelfth and thirteenth assignments allege error in the court's action in confirming the report of the commissioners.

---

The right to mines of gold and silver was considered one of the *jura regalia* under the common law of England. In this country we have no *jura regalia.* Whoever owns the land owns everything contained in it, including mines, unless they be expressly reserved, and the same law is applicable to a transfer by the Federal Government.

This matter of the ownership of mines was discussed in the case of *Moore* v. *Smaw,* 17 Cal. 199, where the court in its opinion as delivered by the Chief Justice (now Mr. Justice Field), says :

"In the great case of *The Queen* v. *The Earl of Northumberland,* 1 Plowden, 310, which was argued before the barons of the exchequer and all the justices of England, it was held by their unanimous judgment 'that by the law all mines of gold and silver within the realm, whether they be in the lands of the Queen or of the subjects, belong to the Queen by prerogative, with the liberty to dig and carry away the ores thereof, and with other such incidents thereto as are necessary to be used for the getting of the ore;' and also ' that a mine royal, either of base metal containing gold or silver or of pure gold and silver only, may, by the grant of the King, be severed from the Crown, and be granted to another, for it is not an incident inseparable to the Crown, but may be severed from it by apt and precise words.' This case was decided in 1568, during the reign of Queen Elizabeth, and continues until this day an authoritative exposition of the doctrine of the common law. It is conclusive to the point that the right to the mines was not regarded by that law as an incident of sovereignty, but was regarded as a personal prerogative of the King, which could be alienated at his pleasure."

The title to mines in Maryland was vested by the charter in the lord proprietary, as he was called, subject only to a royalty of one-fifth part of them in favor of the Crown.

In an exposition by Kilty of "original titles as derived from the proprietary government, and more recently from the State of Maryland," called the Landholder's Assistant, and which has been referred to by counsel on both sides in the argument as a work of authority, it appears that the proprietary formulated from time to time rules and regulations for the disposition of his land, called " conditions of plantations, instructions, etc." These " conditions of plantations, instructions, etc.," became matter of record, and, so far as extant among the public records of the State in the year 1808, are printed in the work referred to, which was issued in that year, and were originally carried into effect by some one or other of his lordship's agents and chief officers in the province, such as his " lieutenant general," his " chief governor," his " lieutenant governor," and later by the governor and council, and others charged with the management of land affairs.

Three steps were necessary for transferring the title from the proprietary to the individual seeking the patent. The first was a warrant issued by the

of appraisement as to a portion of the land embraced in the
map of the proposed park, leaving other portions of that land

---

proper officer and which was the authority to the surveyor of the county to
survey and lay off the particular quantity of land. The next step was the
returning by the surveyor of his certificate of survey; and the third step was
the issue of the patent. In the course of time another form of warrant came
to be issued, called the warrant of resurvey. Parties having several con-
tiguous tracts by patent from the land office procured from it a warrant of
resurvey authorizing the surveyor to resurvey those tracts, the grounds
assigned for which were the uncertainty of existing bounds and the desire
of the parties to connect several adjoining tracts in one survey. At first
the privilege of taking in adjoining vacancy over and above the quantities
originally granted did not attach to this kind of warrants, but this subse-
quently became the main object of these resurveys. On resurveys lands
included in older surveys were excluded and allowance made for the defi-
ciency, either in contiguous vacancy or elsewhere. On the other hand, where
land had been included in surveys beyond the quantity to which the party
was entitled, the excess denominated "surplus land," was claimed by the
proprietary, and, as this surplusage was more common than vacancy, it
gave rise to numbers of warrants, sometimes demanded by parties when
they found that the excess of their grants could not be concealed, and on
other occasions issued by direction of the government where information
of surplusage was obtained. In 1735 it was determined to grant warrants
to the first discoverers, enabling them to make resurveys on the lands of
other persons and to become purchasers of the surplusage found therein.

All the patents that were issued by the proprietary contained an excep-
tion of royal mines, and we understand those terms to mean mines of gold
and silver; and the consequence was that they did not pass by these
grants, but remained in the proprietary as his separate property. Not-
withstanding the common-law maxim as to the ownership of property, *cujus
est solum, ejus est usque ad caelum*, there may be two separate owners of the
same land. A man may own the surface of the ground and underneath the
surface may be owned by another person, so that, as the patent issued with
that reservation, the proprietary remained the owner of the mines.

The present owners of the land, deriving title by mesne conveyances
from the patents, claim that they are entitled to the mines, but as the
patentee did not take the mines of gold and silver I do not see how the last
owner has acquired title thereto. There can be no question here of adverse
possession or title by adverse possession in the position taken by the
claimants to these mines. The then proprietary was divested of his title
by the American Revolution. When the Revolution broke out the British
subjects left this country, perhaps for their country's good, and the effect
of the Revolution, I might say with regard to the royalty that had been
reserved by the King, was to transfer it to the State, and the property of
the proprietary was confiscated by an act passed by the State in 1780, c.

unacted upon.   We understand this objection to refer to the
course of the park commissioners in securing the final action

45, of the session of that year.   When you contrast this act of confiscation
with the act passed by the Congress of the United States during the late
civil war, it will be seen that the latter act subjected the property of those
in hostility to the government to seizure and condemnation by judicial pro-
ceedings and sale and directed that the proceeds of the sale should be paid
into the Treasury of the United States.   If any property was seized and
such legal proceedings were not taken the title never was passed, but
remained in the owner.   The act of Maryland is much stricter in its
terms.

After a long recital of grievances committed by England the act of
Maryland declares, " And it is hereby enacted and declared that all property
within this State, debts only excepted, belonging to British subjects shall
be seized and is hereby confiscated to the use of this State."   In section 7,
on the assumption that the title was at once vested in the State by the pre-
ceding enactments, the act goes on and directs that certain property,
being certain iron works, lands and stock therein mentioned, " shall be, and
are hereby, appropriated and set apart as a fund for making good and
sinking certain bills of credit which had been emitted by the State."   The
act further enacted " that all British property confiscated in virtue of this
act and not thereby appropriated for the redemption of the bills of credit
lately emitted by this State and for the payment of debts shall be subject
to the disposal of the General Assembly."

To remove any doubt of the meaning of the law, in c. 49 of the same
session it is enacted that certain commissioners shall be appointed " for
the purpose of preserving all British property seized and confiscated by the
act of the present session," just before referred to, " and that the said
commissioners shall be, and are hereby declared to be, in the full and actual
seisin and possession of all British property seized and confiscated by the
said act without any office found, entry, or other act to be done, and the
said commissioners shall and may, as soon as may be, appoint proper per-
sons in all cases that they may think necessary to enter into and take pos-
session of any part of the said property," etc.   This was a complete
divesting at once of the title to the property owned by British subjects and
vesting it in the State or in the commissioners to represent the State.   Chap-
ter 51 of the same session goes on and appropriates the manors owned
by the late lord proprietary in several counties to certain purposes, and it
provides " that this State will forever warrant and secure to the purchasers
and their heirs any British property sold in pursuance of this act and will
protect them in the peaceable possession thereof."   This was followed by
another act relating to forfeited estates and sales of reversionary rights
where they were estates tail.   There was another act in relation to
claims against forfeited property by individuals, and section 2 of the latter
act provided for the confiscation of the property of British subjects which

of the President upon a portion only of the lands described in the map as originally filed; and the contention is that the

---

may be in the possession of others without any proper claim upon them. All of which shows the scope of the confiscation aud that these acts were intended to reach every piece of property that belonged to British subjects. This intent runs all through them in fact and it is not necessary to refer to them in further detail. It is sufficient to say that it was the effort of the State to appropriate everything, every species of property that belonged to British subjects, and, of course, that would include mines as well as anything else. Certain grace was given to the owners of the property. They were allowed a certain time in which to come forward and swear fealty to the State and in that way save their property.

During the argument an inquiry was made whether the State of Maryland had ever made any reservation in her patents, issued since the revolution, of mines and quarries, or whether its legislation was silent on that subject, from which it might be inferred that she never intended to confiscate that species of property. A partial answer to that inquiry at least is found in c. 20 of the act of 1783 relating to the sale of confiscated property, by which it is enacted " that in all sales of the said lands there shall be a reservation of one fifth part of all mines of gold or silver found thereon to this State, which reservation shall be expressed in the deeds for the said lands." That showed that the subject of the ownership of mines was brought to the attention of the legislature, and that the State assumed itself to be the owner of the mines as well as of the surface of the land, and hence assumed that granting it would pass the mines unless there was a reservation, and so the State reserved one-fifth in all mines that might be found on this confiscated property. Now, it is true that there is no mention in the legislation of the State in regard to mines or mineral lands except in connection with the sale of the property, and the only object of any legislation would be directed towards a sale of the property, and it would have been useless to direct any sale of mines in the State at that time, which would account for the absence of legislation on that subject. It was not suspected at that time that any mines existed in the State. If there had been any idea that there were mines existing, there is no room for doubt at all, in view of the spirit manifested in this legislation in the series of acts running nearly twenty years, that the State would have been prompt in declaring as forfeited the interests of British subjects therein. It appears that nothing was ever done by the State that amounted to a relinquishment of any rights that were vested in it by confiscation. If there were any mines, however, they were the property of the State, by another act of the State, which act assumes that the State was the owner of the same by reason of the action taken which I have before referred to. In the case that I have heretofore cited — Moore v. Smaw, et al. — there was no hesitation at all upon the part of the justice, in delivering the opinion of the court,

map was a finality, so that if it turned out that the sum pre-
scribed by the act of Congress would not suffice to pay for all

in holding that "at the date of the cession of California to the United
States no minerals of gold or silver had been discovered in the land em-
braced by the grant to the Fernandez or by the grant to Alavrada, and
of course no proceedings had been taken by which any individual inter-
est in them was acquired from the government. They constituted, there-
fore, at that time the property of the Mexican nation, and by the cession
passed, with all other property of Mexico, within the limits of California
to the United States."

Under the common law of England there was an implied reservation of
mines of gold and silver. Looking at the terms of the cession under the
act of 1791, we will find that they are much stronger than those employed
in the act of cession of property in California to the United States, because
they contained absolute words of cession, while the other does not. The
language is " that all that part of the said territory called Columbia which
lies within the limits of this State shall be, and the same is hereby, acknowl-
edged to be forever ceded and relinquished to the Congress and Government
of the United States in full and absolute right and exclusive jurisdiction, as
well of soil as of persons residing or to reside thereon, pursuant to the
tenor and effect of the 8th section of the first article of the Constitution of
the Government of the United States." These words, of course, are to be
taken distributively. Congress and the government were given full and
absolute right over persons, and they are given the full and absolute right
to the soil and exclusive jurisdiction over both person and soil. It is
rather difficult to see how they could be more specific in conveying what-
ever rights the State had in the land and soil. The State, of course, could
only transfer to the United States the interest which it had; and to make
the matter as clear as possible and remove doubt a proviso was added:
" That nothing herein contained shall be so construed to vest in the United
States any right or property in the soil so as to affect the rights of individ-
uals therein." In other words, the State did not undertake to grant away
the rights of individuals, but did undertake to give to the United States all
her rights, both as to the soil and persons who resided in the part of the
State ceded. The State relinquished all rights which she had and at the
same time provided that the United States should not have any right in
the soil that would affect the rights of individuals. The history that I have
given of this property excludes all idea that the law did vest in the individ-
uals the right to the mines. Nobody can doubt that the public domain
passed to Congress, and that it has always acted upon that assumption in
granting patents to vacant land that it has sold; and we can see no reason
to doubt that the right of the State to any mines on the land separate from
it also passed by this grant of the territory " in full and absolute right and
exclusive jurisdiction as well of soil, as of persons residing or to reside
thereon."

the tracts mentioned in the map, or if, for any other reason, the commissioners should exclude from their final selection

---

We cannot escape from the conclusion that all public property of the State of Maryland within the District passed by the cession, and that the legislature by its act of cession transferred all interests in any possible gold mines in this District to the United States.

But a patent was introduced at the argument of a later date from the State of Maryland to Robert Peter, under whom these present owners claim title, and that patent has no reservation of any gold or silver mines, and it was claimed that for this reason whatever interest the State formerly had in these mines passed by this patent. That patent was dated in 1803. It will be remembered that the Congress of the United States assumed formal jurisdiction over this District and provided for its government by the act of February 27, 1801, three years before the date of this patent. The State of Maryland, of course, could not convey land that had already been ceded to the United States. But this paper suggests certain serious inquiries. The patent was a resurvey patent based upon a warrant dated the 12th day of May, 1800, which was nine months before the actual assumption of jurisdiction here by Congress; and the first inquiry is whether that did or did not give the parties equitable title, being prior to the time that the land was actually taken possession of under the cession by the Congress of the United States. That inquiry suggests one or two questions. The first is, under the law of Maryland did the land laws remain in force in that part of the territory ceded until the removal of the seat of government; and, if so, did the issuing of this warrant give an inchoate title, an equitable title which would prevail against the subsequent acquisition of the same legal title by the United States? The letter of the law seems to be that in all cases of resurveys no equitable title is created until the certificate of survey is returned to the land office. Upon the issuing of the warrants of resurvey the party had two years under the law within which to have the survey returned and pay the fees. It seems to me that no equitable charge could be laid against this property by reason of the issuing of the warrant of resurvey. The patent does not say that that survey was returned to the surveyor's office. The warrant was not issued until 1800 and the patent was not issued until 1803, and the presumption would, therefore, be that the certificate of survey was not returned until after 1801, so that there is nothing upon the face of this patent which would justify us in saying that there could be an equitable title acquired through the warrant.

There is a still more important question, and that is whether the State of Maryland at that period could convey any interest, legal or equitable, in the property. In the act of 1791, ceding this property to the United States, there is this proviso: "That the jurisdiction of the laws of this State over the persons and property of individuals residing within the limits of the cession aforesaid shall not cease or determine until Congress shall by law provide for the government thereof under their jurisdiction in manner

any tract originally included in the map, the whole proceeding would be vitiated, and the purpose of the act defeated. We

provided by the article of the Constitution before recited." Now, this continues in force the jurisdiction of the laws of the State of Maryland over the persons and property of individuals residing therein. To make that applicable to the present case it would be necessary to have extended it to the property held by the State; but it seems to me that that extended no further than to say that the laws that affected private rights should continue in force until proper provision was made by Congress. See what the consequence would be if another construction had been given to it. The State of Maryland extended to the Virginia shore, and suppose that after this cession and before 1801 the State of Maryland had undertaken to cede to the State of Virginia the whole bed or bottom of the Potomac River, from its source to its mouth, including that part in the District of Columbia, doubtless Congress could have had something to say about it after the cession had been made. We are satisfied, therefore, that the proviso does not continue in operation the land laws of the State of Maryland, and consequently no title could be derived at the dates of this survey and patent or at the date when the warrant upon which it was based was taken out. · We are satisfied that the proviso does not continue in operation the land laws of the State of Maryland as to the public lands owned by the State within the said District, and that consequently no title to such lands could be obtained by patent from the State after the act of 1791.

At a much later time a citizen of Maryland who owned a tract of land in this District died, making a will disposing of his land and appointing an executor, and, the executor having declined to act, the chancellor appointed a trustee to carry out the trusts of the will and the title was declared vested in that trustee and a sale directed to be made, and the proceedings were in accordance with the law of Maryland; but this court had no hesitation in declaring the whole proceedings null and void for want of jurisdiction in the chancellor to give the relief asked for.

Upon the whole case, therefore, we are of the opinion that if there are any deposits of gold in this ground they are the property of the United States. This motion upon the part of the Government is granted.

Subsequently a motion was made to rescind the order, granting the motion on the part of the government, upon the ground of newly discovered evidence, the nature of which is shown in the second opinion of the court, taken from pages 212 to 218 of the record.

By Mr. Justice Cox:

In this matter a motion has been made to rescind the order heretofore passed by this court directing the commissioners to disregard the evidence as to the deposits of gold in two of the tracts, numbered 39 and 42, the former being the property of Shoemaker and the latter that of Truesdell.

are unable to see the force of this view.   The function of the map was not to finally commit the commissioners to taking

---

It will be remembered that the conclusion announced by the court was founded upon a patent which was introduced on the part of the Government and dated in 1772 from the proprietor to one White, by which the royal mines — that is, the mines of gold and silver — were expressly reserved to the proprietor, and our argument was that they were derived through confiscation by the State and on behalf of the United States through the cession of 1791, and if such gold deposits existed there they were the property of the United States.

The present motion is based upon additional evidence said to have been discovered since the first order.

The first patent granted to White affecting the premises was on a resurvey in 1760, in which the land was granted without any reservation of royal mines, and it is supposed that those claiming under White were allowed to refer their title back to the first muniments of title, and that it is not affected or vacated by the subsequent patent of 1772, in which there was an express reservation of all royal mines.

As to the character of the tenure of land in this country since the revolution it has been said that it has become allodial.   That is all true, but it must be remembered that at the date of the commencement of these tenures, all land in Maryland was held as essentially feudal.   In the first place, the charter of Lord Baltimore conveyed to him this land, not to be held by knight's service, but by fealty, and a certain proportion of the precious metals that might be discovered on the land was reserved, and if Lord Baltimore granted this land in fee simple afterwards, the grantee held not of the Crown but of him, the lord proprietor.   In this charter it is expressly stated that, notwithstanding the statute of *quia emptores*, Lord Baltimore was authorized to create minor court barons and grant patents to lands to be held in fee simple, but upon the rendition of such services, customs and rents as he should think proper, to be laid by him and not by the Crown, and in all these patents issued by him in fee simple there was that reservation and fealty, at least generally, in place of any other service; so that relation, as to the tenure by which the land was holden, existed all through between the lord proprietor and his grantees just as it did under the feudal system.

Now, to go back to the common law.   A lessee for life or years could surrender his estate and take a new estate from the reversioner.   Not only could that be done by the tenant, but the acceptance of a new estate by the grantee was itself a surrender of the old one, and that upon the principle that the two could not consistently stand together, and the acceptance of the later one necessarily involved a surrender of the first.   For instance, if a lessee for years should take a lease for his own life or that of another man, the acceptance of the latter would necessarily be a surrender of the first, or if a lessee for forty years accept one for twenty-five years, or if a

all the parts included in it, but was to facilitate their proceedings in dealing with the owners. Congress could not have

---

lessee for life accept a lease for years, say a lease for twenty years, the acceptance of the one would involve a surrender of the other.

Upon the question of what shall be considered in law a surrender of lands, it is said in Sheppard's Touchstone, 301, (edition of 1826, with notes by Atherly) : " If lessee for life, or years, take a new lease of him in reversion, of the same thing in particular contained in the former lease for life or years; this is surrender in law of the first lease. 14 H 8, 15; Plow. 194; Dyer, 28; Co. 10, 67. As if lessee for his own life, or another's life, in possession or reversion, take a new lease for years; or a lessee for forty years takes a new lease for fifty years; the first lease in both these cases is surrendered. And this rule holdeth, albeit the second lease be for a less time than the first, as if lessee for life accept a lease for years, or lessee for twenty years accept a lease for two years. Perk. § 617; Co. 5, 11; Fitz. Sur. 3; Co. Super Lit. 218; 37 H 6, 17. And albeit the second lease be avoidable, as being made upon condition, as if lessee for twenty years take a new lease for twenty years, upon condition that if such a thing happen the second lease shall be void, and the thing do after happen; in this case, both these leases are become void; as where the lessor doth grant the reversion to the lessee upon condition, and after the condition is broken. Or if the second lease be made by tenant in tail, or the like : as if a man made a lease for years, of land, and then make a feoffment to another of the land, and then take back an estate to him and his wife of the land, and then make a new lease to the lessee for ten years; this is a surrender in law of the first. lease; but if the second lease be merely void, then it is otherwise. Dyer, 140, 141; Dyer, 272; Dyer, 178, 177; Co. 5, 54, 55; Kely. 70. And therefore, if the lessor do, by words of covenant only, promise to his lessee that he shall have a new lease, and do never actually make it; this is no surrender in law. And this rule, as it seems, holdeth also, albeit the second lease be to the lessee and a stranger or to the lessee and his wife, (Dyer, 140, 141,) and albeit the second lease be by word only, and the first lease be by deed, if so be the thing granted by the lease be such a thing as may pass by word without writing; and albeit the second lease be in another right, as if the husband have a lease for years in the right of his wife, and then take a new lease to himself in his own name; and albeit the first lease be to begin presently, and the second be to begin at a day to come, or e converso; and albeit there be a mean estate between, as if the land be let to A for years, and after let to B for years, to begin after the first term, and the assignee of A doth take a new lease. Dyer, 178; Pasc. 40 El.; Co. Super Lit. 338; Co. 6, 69, 10, 53, 67, 5, 11; Dyer, 280; Dyer, 93, 112. So if one demise land for ten years to one, and after demise it for ten years to another, to begin at Michaelmas, and after the first lessee accept a new lease; in all these cases there is a surrender in law of the first leases. Dyer, 46; Co. 2, 60. And if there be two lessees for life, or years, and one of them take a new lease for

meant that the validity of the whole scheme should depend
upon the accuracy with which the commission should define

---

years, this is a surrender of his moiety; whereby it doth appear that a
surrender in law may be made of some estates which cannot be surrendered
by a surrender in fait for *fortior est dispositio legis quam hominis.* And
hence it is, that a corporation aggregate may take a surrender in law with-
out deed, although it cannot make an express surrender without deed. Co.
6, 69, 10, 67."

Now, technically there was no surrender of such a thing as a fee simple
estate at common law. The owner of the estate might reconvey to his
grantor or the latter's legal successor and take a new title. There may
have been some particular object in doing that, though, of course, he is
supposed to have taken the whole title in the first instance. I do not know
that there are any examples of this since the days of the Saxons surrender-
ing their estates to William the Conqueror and taking them back again
under the conditions of feudal tenure imposed by him. Still, such a thing
could be done as the owner of a fee simple granting back his title and taking
a new grant if there was any object in doing it. Under the rules promul-
gated by the proprietary of Maryland that very thing was permitted — that
is, the practice of surrendering the original grant in fee simple and taking
a new title from the lord proprietor. Under these rules the owner of two
contiguous estates, who might desire to have them resurveyed, might sur-
render them and take a new title for the two consolidated into one, or the
owner of one estate might surrender his grant and take a new one and of
the contiguous vacant land as a new entirety. The rules above referred to
expressly provided that special warrants might be issued to resurvey two
or more contiguous tracts for the person owning the same and to lay them
out in one entire tract.

The third section of the instructions issued by the proprietary May 5,
1684, to certain persons whom he by commission of that date appointed a
land council, and by which their powers and authority were defined, reads as
follows: "To any person or persons haveing two or three or more tracts of
land contiguous or adjoining one to the other, you may (upon suit made)
grant special warrant to resurvey and lay out the same into one entire tract
with liberty of takeing in or adding thereunto what waste land shall be
found contiguous, and grant pattent for the same upon such conditions and
tearms as you shall seem meete and reasonable, the person sueing for the
same surrendering up the several former grants thereof to our chancellor or
chancellors for the time being to be vacated upon record." Now, here is an
express provision that the grantee of the fee simple might surrender his
title to the lord proprietor and take a new title, and for the same reason
that at common law prevailed in reference to leases for life and for years;
but in that case the provision was not necessary, because when a new lease
was made it necessarily involved a surrender of the original title, the orig-
inal cession. Every one of these grants was a grant of the entire thing, for

in advance the several tracts with whose owners negotiations were to be had. It seems to us that it was a sufficient and

---

the whole property right, and when one grant was surrendered a new grant was taken for additional land. The second grant was made upon an entire resurvey of the land; the two estates were different and the party could not hold both estates; they were not consistent, and that is the result in this very case. Here, in the first place, in 1760, was a patent for six hundred and eighty-one acres granted upon a warrant of resurvey; upon a resurvey of said patent in 1772 it was discovered that the land embraced in it was covered in part by patents of several prior patentees; that it contained portions of several older grants which had been improperly included in it, by the lines of one of which older grants it was divided into two distinct and unconnected parts; the surveyor thereupon in his return of the resurvey included the one of said parts nearest the beginning, which contained one hundred and fifteen acres, to which he added thirty-six acres of contiguous vacancy, making in all one hundred and fifty-one acres, and for this the patent of 1772 was granted. The patent for the rest of the land is not produced before us; but we may assume that there were two several patents issued, one of which embraced this land, and, of course, it is held under the conditions imposed by the grant. It won't do to say that that part of the land embraced in this patent of one hundred and fifty-one acres is held by the title acquired in 1760, because it is held as a part of a new and entire tract, and upon different terms, and for a different rental, and therefore there is an inconsistency in his claiming to hold the land both under the patent of 1760 and that of 1772. The original entry of six hundred and eighty-one acres has disappeared entirely, and that land is now held under two different patents. Any acceptance of a new lease providing different terms of rental and for a different period involves the surrender of the old lease, and so acceptance of a new grant from the lord proprietor embracing part of that which was formerly held under the old grant necessarily involved a surrender of the original title. The requirement that the original patentee shall formally surrender the title to be affected by the new grant has never been rescinded as far as we are advised. In point of fact, however, the practice has fallen into disuse. It appears from Mr. Kilty's statement that the practice was simply to enter on this certificate of resurvey an order for the patent to be surrendered, but finally the practice of surrendering the old certificate or patent seems to have been abandoned entirely. Now, there were two very good reasons for that: First, it was not necessary because of the very fact that an acceptance of a new title inconsistent with the former operated as a surrender of the former, and, next, because of the doubt that seems to have been raised of the effect of the claims in the matter of priority of some other individual who might in the interim between the old and the new patent have obtained a patent covering the same land, and as between several parties holding under different patents the one who held the old title would be regarded as retain-

reasonable compliance with the law if the map, as finally acted upon by the President, showed the location, quantity

---

ing whatever interest he acquired under it for the purpose of preserving priorities; but that is altogether a different question from the relation of the tenant and the old proprietor, and as between them it seems to be very plain that the acceptance of a new title or a new grant was conceded to supersede the old title, and therefore we think that the new title must stand. There has been something also presented to us to affect our judgment in that particular. As another item of evidence it seems that James White originally conveyed his estate to Robert Peter and Adam Stewart as tenants in common. By an act of the assembly of Maryland the property of all British subjects was confiscated, and under that act Adam Stewart's was confiscated, and certain commissioners were appointed to take charge of the confiscated property and dispose of it. Adam Stewart's interest in this property was sold by these commissioners. I do not remember the date of the sale, but that is quite immaterial; somewhere about 1785. Afterwards, in 1792, the chancellor made a conveyance of the property which Adam Stewart had thus forfeited to Robert Peter. The deed from the State to Robert Peter contained no reservation of the mines, and it is claimed that this last deed from the commissioners to Robert Peter of the interest of Stewart's vested in Peter all interest in whatever mines might be on the property. An inspection of that instrument will show that it purports to do nothing of the sort. The deed recites that about two hundred and fifty acres of land, which it does not locate anywhere, the property of Adam Stewart, were confiscated and sold to Robert Peter, and the deed professes to convey the property of Adam Stewart and nothing else. The property that Adam Stewart had was an undivided moiety in the land and nothing more, and the deed from the chancellor does not on its face purport to convey anything else than exactly the property that was owned by Adam Stewart in conjunction with Robert Peter. The construction of the deed, therefore, does not bear out the claim on the part of the present holders; if it did, however, the result would have to be the same, because the deed from the State was not made until 1792, after the cession of the District to the United States, and the cession passed to the United States all the public domain within the limits of the District — that is, that part of it that had been a part of the State of Maryland — because it is said that all of the territory "is hereby acknowledged to be forever ceded and relinquished to the Congress and Government of the United States in full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon." If this does not convey all the territory to the United States, then the United States never did acquire it, because that is the only cession by which a conveyance was made of the title to this property to the United States, and its title to it depends upon this cession and nothing else. All this property in the District that had formerly belonged to Maryland was ceded by this act in 1791, and, that having been done, the State of Maryland could

and character of the parcels of land to be taken, with the names of their owners.

The fifteenth and sixteenth assignments, which complain of the course of the court in adopting and acting upon the decision of the President of the United States approving the appraised values of part only of the land selected for the Rock Creek Park, present the same contention in another form, viz., that the court and commissioners were concluded by the enumeration of tracts contained in the map when first prepared, and call for no further remarks.

The fourteenth assignment charges the court with error in

---

not thereafter have vested in any one the title to any part of the property. We do not find anything, however, in the circumstances referred to which affects this case. A point was made in argument which had not been made before and not founded upon any new facts in reference to the character of these proceedings before the chancellor upon the application for a repatent. Robert Peter had a resurvey patent in 1803 signed by the chancellor·and founded upon a warrant of resurvey issued in 1800, about six or eight months before Congress had passed its law assuming jurisdiction over the District, and we held that that could not pass title to land in the District; but it is claimed that the proceedings before the chancellor as·a judge of the land court was in its nature a judicial proceeding, and that all such proceedings and the result of them are saved by the act of Congress which assumed jurisdiction over this District. That is entirely a misconception, we think, of the act of Congress. All that it says is this: "That in all cases where judgments or decrees have been obtained or hereafter shall be obtained on suits now pending in any of the courts of the Commonwealth of Virginia or of the State of Maryland, where the defendant resides, or has property within the District of Columbia, it shall be lawful for the plaintiff in such cases, upon filing an exemplification of the record and proceedings in such suit with the clerk of the court of the county where the defendant resides or his property may be found, to sue out writs of execution thereon return-. able to the said court, which shall be proceeded on in the same manner as if the judgment or decree had originally been obtained in said court." Now, this applies only to contests between private parties in which execution may issue and does not provide for a proceeding in which the State may be a party. The language is exclusively applicable to private parties.

We think, therefore, upon the whole, that none of the new considerations which have been presented to us shake our former conclusion and the motion to rescind the order·is overruled. What I have said applies to the Shoemaker tract with more force than to the Truesdell tract, because that is admitted to be a new grant or, at least, taken under the patent in 1772 and not derived from a patent in 1760 at all. ·

refusing to allow interest on the amounts assessed as the values for lands selected for the Rock Creek Park. The argument shows that the interest claimed was for the time that elapsed between the initiation of the proceedings and the payment of the money into court. The vice of this contention is in the assumption that the lands were actually condemned and withdrawn from the possession of their owners by the mere filing of the map. Interest accrues either by agreement of the debtor to allow it for the use of money, or, in the nature of damages, by reason of the failure of the debtor to pay the principal when due. Of course, neither ground for such a demand can be found in the present case. No agreement to pay the interest demanded is pointed to, and no failure to pay the amount assessed took place. That amount was not fixed and ascertained till the confirmation of the report. Then some of those entitled to the assessments accepted their money, the plaintiffs in error declined to accept, and the amounts assessed in their favor were paid into court, which must be deemed equivalent to payment.

It is true that, by the institution of proceedings to condemn, the possession and enjoyment by the owner are to some extent interfered with. He can put no permanent improvements on the land, nor sell it, except subject to the condemnation proceedings. But the owner was in receipt of the rents, issues, and profits during the time occupied in fixing the amount to which he was entitled, and the inconveniences to which he was subjected by the delay are presumed to be considered and allowed for in fixing the amount of the compensation. Such is the rule laid down in cases of the highest authority. *Reid* v. *Hanover Branch Railroad*, 105 Mass. 303; *Kidder* v. *Oxford*, 116 Mass. 165; *Hamersley* v. *New York City*, 56 N. Y. 533; *Norris* v. *Philadelphia*, 70 Penn. St. 332; *Chicago* v. *Palmer*, 93 Illinois, 125; *Phillips* v. *South Park Commission*, 119 Illinois, 626.

These various contentions and objections did not escape the attention of the court below, but were disposed of, as they arose in the proceedings, in opinions of great research and ability, which appear in the record. We have briefly reviewed

them here, not to add to what was so well expressed in those opinions, but to show that the questions so zealously and ably pressed upon us have not been disregarded.

Our conclusion is that we find, in the legislation creating the park and in the proceedings under it, no infringement of the constitutional or legal rights of the plaintiffs in error, and the judgment of the court below is accordingly

*Affirmed.*