## WILLSON v. McDONNELL.

(Court of Appeals of District of Columbia. Submitted October 13, 1919. Decided December 1, 1919. On Motion for Reargument, December 24, 1919.)

### No. 3248.

1. **District of Columbia** �köm1—**Title to real estate as absolute in District of Columbia as elsewhere.**

    Under Maryland Act of Cession, § 2, and subsequent proceedings thereunder, the title to real estate within the ceded territory is as absolute as title to real estate in Maryland or any other state.

2. **Eminent domain** �köm45—**Property in District of Columbia may be taken for public use.**

    The enjoyment of real estate within the District of Columbia is subject to reasonable regulation, and, under the right of eminent domain, the property may be taken for public use upon just compensation.

3. **Constitutional law** �köm251—**District of Columbia** �köm3—**Eminent domain** �köm70—**Power of Congress is subject to Constitution.**

    The constitutional guaranties of life, liberty, and property, including the provisions of the Fifth Amendment prohibiting the taking of life, liberty, or property without due process of law, or the taking of private property for public use without just compensation, applies in the District of Columbia, notwithstanding Const. U. S. art. 1, § 8, par. 17, authorizing Congress to exercise exclusive legislation in all cases within the District.

4. **Constitutional law** ⊚⇒227—**Eminent domain** ⊚⇒2(1)—**War** ⊚⇒10(1)—**Resolution prohibiting landlord from recovering possession unconstitutional.**

    The Saulsbury Resolution, prohibiting recovery of possession of leased real estate during the war so long as the tenant continues to pay the rent at the agreed rate, except in certain cases, is unconstitutional, as taking private property without just compensation, and for failure to operate uniformly, in that it discriminates between owners of property under lease at the date of the resolution and other owners.

5. **Constitutional law** ⊚⇒240(1)—**Regulation under police power must be uniform.**

    If the business of renting property is so far affected with a public interest as to be subject to regulation by Congress in the exercise of the police power, such regulation must be reasonable and operate with substantial uniformity.

6. **War** ⊚⇒1—**Does not supersede Constitution.**

    The Constitution is not superseded by a declaration of war.

Appeal from the Supreme Court of the District of Columbia.

Landlord and tenant proceeding by Curtis C. McDonnell against Hannah T. Willson, instituted in municipal court. From a judgment of the Supreme Court in favor of plaintiff, defendant appeals. Affirmed.

Henry E. Davis, of Washington, D. C., for appellant.

Leon Tobriner and Byron U. Graham, both of Washington, D. C., for appellee.

ROBB, Associate Justice. Appeal from a judgment in the Supreme Court of the District for the plaintiff, appellee here, under law rule 19 of that court, in a landlord and tenant proceeding instituted in the municipal court.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

According to the averments of the declaration, plaintiff was a bona fide purchaser of the premises in question, necessarily required them for his own occupancy, and had given legal notice to the tenant to that effect. The defendant, in her affidavit of defense, denied that plaintiff necessarily required the premises for his own occupancy, and demanded a jury trial.

Appellee contends that the "joint resolution to prevent rent profiteering in the District of Columbia," commonly known as the Saulsbury Resolution (40 Stat. 593), and invoked by the appellant, is unconstitutional, and hence that it is immaterial whether or not he necessarily required the premises for his own occupancy. In the preamble to the resolution it is declared—

"essential to the national security and defense, and for the successful prosecution of the war, to establish governmental control and assure adequate regulation of real estate in the District of Columbia."

It is provided in the resolution that until a treaty of peace shall have been definitely concluded between the United States and Germany—

"no judicial order, decree, or judgment for the recovery of possession of any real estate in the District of Columbia, now or hereafter held or acquired by oral or written agreement of lease for one month or any longer period, or for the ejectment or dispossession of a tenant therefrom, shall be made," and that "all leases thereof shall continue so long as the tenant continues to pay rent at the agreed rate and performs the other conditions of the tenancy which are not inconsistent herewith, unless the tenant has committed waste, or has been guilty on the premises of conduct which constitutes a nuisance or a breach of the peace, or other misdemeanor or crime, or that the premises are necessarily required by a landlord or bona fide purchaser for occupation, either by himself or his wife, children, or dependents while he is in the employ of or officially connected with any branch of the government, or where the property has been sold to a bona fide purchaser for his own occupancy."

The resolution further provides that where an order, decree, or judgment has been made, but not executed, before the passage of the resolution, and the court is of opinion that it would not have been made had the resolution been in force, it shall be rescinded or modified "in such manner as the court may deem proper for the purpose of giving effect" to the resolution. The resolution also provides that—

"all remedies, at law or in equity, of the lessor based on any provision in any oral or written agreement of lease that the same shall be determined or forfeited if the premises shall be sold are hereby suspended while this resolution shall be in force, and every purchaser shall take the conveyance of any premises subject to the rights of all tenants in possession thereof under the provisions of this resolution; that the term 'real estate' as herein used shall be construed to include any and all land, any building, any part of any building, house, or dwelling, any apartment, room, suite of rooms and every other improvement or structure whatsoever on land situated and being in the District of Columbia."

[1, 2] It hardly will be denied that under the Maryland Act of Cession (Acts 1791, c. 45, § 2), and subsequent proceedings thereunder, the title to real estate within the territory ceded became and is as absolute as the title to real estate in Maryland or any other state of the Union. Bursey v. Lyon, 30 App. D. C. 597. The enjoyment of that estate is subject, of course, to reasonable regulation, and, under

the right of eminent domain, an attribute of sovereignty, the property may be taken for public use upon just compensation. Shoemaker v. United States, 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; C. & O. Canal Co. v. Union Bank, 4 Cranch, C. C. 75, 80, Fed. Cas. No. 2,653. In the latter case, cited with approval in the former, in speaking of the contention that the United States under the Act of Cession was without authority to take private property for public use, the court said:

"We think it is sufficient answer to this objection, to say that the United States do not, by this inquisition, or by the charter to the Chesapeake & Ohio Canal Company, claim any right of property in the soil. They only claim to exercise the power which belongs to every sovereign to appropriate, upon just compensation, private property, to the making of a highway, wherever the public good requires it."

[3] It will be well, before proceeding to an analysis of the resolution before us, to determine to what extent the people of this District are protected by the Constitution of the United States. The assertion has been made that, Congress having power "to exercise exclusive legislation in all cases whatsoever" in the District (Constitution, art. 1, § 8, par. 17), the provisions of the Constitution, which protect persons and property in all other places under the jurisdiction of the United States, are without particular force here. To this we cannot accede. It would be an anomalous situation, indeed, if nearly half a million people at the seat of government, under the very dome of the capitol, should suffer such a discrimination and be ouside the protection of the Constitution. Fortunately this question has been set at rest by the Supreme Court of the United States. In Callan v. Wilson, 127 U. S. 540, 550, 8 Sup. Ct. 1301, 1304 (32 L. Ed. 223), Mr. Justice Harlan, speaking for the court, said:

"There is nothing in the history of the Constitution or of the original amendments to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guaranties of life, liberty, and property."

In Wight v. Davidson, 181 U. S. 371, 384, 21 Sup. Ct. 616, 621 (45 L. Ed. 900), the court, speaking of an act regulating assessments on property in the District of Columbia, said:

"No doubt, in the exercise of such legislative powers, Congress is subject to the provisions of the Fifth Amendment to the Constitution of the United States, which provide, among other things, that no person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation."

[4] The title of the resolution in question indicates that it was the purpose of Congress to prevent owners of real estate in this District from collecting excessive rents during the war. That purpose was to be effected by closing the doors of the courts to owners who should attempt to get possession of their property, occupied or to be occupied under oral or written agreements, including those already expired, so long as the tenant or occupant should continue to pay rent at the rate theretofore paid. The owners of property unoccupied at the date of the resolution, or that was built or completed thereafter, were much

more advantageously situated than were the owners of property occupied at that time, since it was permissible for owners of the former class to exact whatever rental tenants would agree to pay. It readily will be perceived that under the provisions of this resolution one who became a tenant after its passage might and probably would pay substantially more than a tenant in possession of like property under similar conditions, and it is quite probable that the new rate would more nearly approximate the fair rental, since the increased cost of living, repeatedly recognized by the government itself, normally would affect the cost of maintenance and upkeep of property and hence the rental rates. No rates, uniform or otherwise, were prescribed by the resolution. In other words, varying rates, under varying conditions and circumstances, were arbitrarily continued in force, with no attempt at uniformity. The resolution not only deprived the citizen of property without compensation, but its operation was not uniform, or intended to be uniform, for it affected and was intended to affect in one way property already under lease and to affect in another way property not under lease. The former class of owners were arbitrarily required to accept a rental based in many instances upon pre-war conditions, and which, therefore, might be so inadequate under existing conditions as to amount to a taking of private property without compensation, while the latter class were left free to exact whatever rent they might obtain. Moreover, the resolution prevents the sale for business purposes of one class of property and permits the sale of another class.

[5] Whether the "business of renting" in the District of Columbia is so far affected with a public interest as to be subject to regulation by Congress in the exercise of police power, we need not now determine. Certain it is, however, that such regulation must be reasonable and operate with substantial uniformity. The resolution before us is unreasonable, because its necessary result is the taking of private property without compensation, and it is not uniform in its operation, for the reason that it is not impartial within the class subject to its provisions.

[6] The Constitution is not superseded by a declaration of war, and experience has demonstrated that ample provision may be made for "the national security and defense" without overstepping its limitations. In the present case, for example, by the exercise of the power of eminent domain, the government might have checked and thwarted any tendency on the part of landlords toward extortion, and, at the same time, have satisfied the due process clause of the Constitution.

While courts always are reluctant to declare a law unconstitutional, and particularly when enacted to meet a supposed emergency, we are convinced that any temporary embarrassment resulting from or incident to an adherence to the supreme law of the land is to be preferred to the far reaching effect of a departure therefrom. The safeguards which the Constitution has thrown around the citizen to protect him in his person and property ought to be jealously guarded and observed.

We are constrained, therefore, to hold that the resolution in question is unconstitutional.

The judgment must be affirmed, with costs.

Affirmed.

### Memorandum of Dissent on Overruling Motion for Reargument.

SMYTH, Chief Justice. Further study of this important case, involving as it does the validity of an act of Congress, has led me to seriously doubt the soundness of our decision, and therefore I think that a rehearing should be granted that the following points, not referred to in the opinion, should be argued, and the case reconsidered by the court:

1. Is the statement of the Congress in the preamble to the Saulsbury Resolution that "it is essential to the national security and defense, and for the successful prosecution of the war, to establish governmental control and assure adequate regulation of real estate in the District of Columbia," binding upon the court as a finding of fact, in the absence of anything to show that it is not true?

2. If binding upon the court, does it establish that real estate in the District of Columbia during the period of the war is affected with a public interest, and therefore subject to the regulatory power of Congress?

3. If subject to that power, can it be said that the owner of the real estate in the case before us is deprived of his property by the resolution without due process of law, under the Fifth Amendment to the Constitution, if the rent which it permits him to receive constitutes a reasonable return for the use of his property?

4. Since the amount which the owner is permitted to receive was agreed upon between him and the tenant before the passage of the resolution, must we not assume, in the absence of anything to the contrary, that it affords the owner a reasonable return?

5. Does the fact that the resolution may permit others to receive a greater return for the use of their property than is permitted to the owner in the case at bar affect in any wise the constitutionality of the act, if the owner is permitted a reasonable return?

Finally, is there any provision of the Constitution which prohibits Congress from passing an act which discriminates between landowners, if to each the act permits at least a reasonable return?