Richard S. Heller, J.
This is an action to recover damages for the appropriation of real property for the improvement and development of the International Rapids Section of the St. Lawrence River pursuant to section 30 of the Highway Law as made applicable by article 5, title 1, of the Public Authorities Law.
At the trial the claim was amended for the purpose of substituting Ralph Hartwell Brubaker individually and as adminis *460 trator with the will annexed of the estate of Berenice M. Brubaker as the claimant herein.
Prior to any of the appropriations involved in this claim, the claimant owned approximately 365 acres of land. The plot was located approximately two miles northeast of the Village of Massena. All of the land lying west of claimant’s plot between it and the Village of Massena was owned by the Aluminum Company of America and that company had two operating plants located on its property lying west of claimant’s property. All of the property lying south of claimant’s property extending to the Grass River was owned by the St. Lawrence River Power Company which was a subsidiary of the Aluminum Company of America. The Aluminum Company also owned property lying to the east of claimant’s property directly abutting claimant’s property on the northerly portion thereof and separated from claimant’s property along the southerly portion by a plot containing approximately 14 acres and having a depth of about 420 feet. Property abutting claimant on the north was owned by Niagara-Mohawk Power Company and another owner.
Claimant’s plot was bisected by a two-lane concrete town road known as Middle Road. About 183 acres of claimant’s property lay to the'north of Middle Road with a frontage on Middle Road of approximately 3,100 feet. All of claimant’s remaining property lay to the south of Middle Road and was bounded on the east by another two-lane town road known as Denison Cross Road. Claimant’s property lying south of Middle Road had a frontage on Middle Road of approximately 1,300 feet and a frontage on the Denison Cross Road of approximately 3,200 feet.
There were no improvements on the property. Portions of the plot lying south of the Middle Road were burdened with two easements. One of these easements was for drainage purposes in favor of the Aluminum Company of America plant site. This easement was 91 feet wide at the west end and approximately 62 feet wide at the east end on Denison Cross Road. The north line of this easement lay some 700 feet south of Middle Road on claimant’s westerly boundary and approximately 250 feet south of Middle Road on claimant’s easterly boundary. It contained approximately 2.76 acres of land. At the intersection of Denison Cross Road and Middle Road there was a triangular sight easement covering approximately two acres at the northeast corner of claimant’s land lying south of the Middle Road.
Farming of the land had been discontinued about 1945 or 1946 and the land had lain unused since that time except for some timbering activities. The land was generally at grade with *461 Middle Road and Denison Cross Road and with other land in the area. Claimant’s property lying north of Middle Road was zoned for agricultural use and the portion lying south of Middle Road was zoned for industrial use.
On May 19,1955, all of claimant’s property lying north of the Middle Road was appropriated. This appropriation is shown as Parcels Nos. 148 and 185 on Map No. 108 of the St. Lawrence River Project, St. Lawrence County, and reference is made to Exhibit 1 annexed to the claim herein for a detailed description of this appropriation. Notice of the appropriation was served on September 27, 1955.
On June 12, 1956, the State appropriated a permanent easement for flooding. This appropriation is shown as Parcel No. 2202 on Map No. 2212 of the St. Lawrence River Project, St. Lawrence County, and reference is made to Exhibit 2 annexed to the claim herein for a detailed description thereof. This easement contained only .15 acres of land and lay entirely within the drainage easement which existed in favor of the Aluminum Company of America. The easement was approximately 300 feet in length and 30 feet in width extending westward from the Denison Cross Road. Notice of the appropriation was served on August 14,1956.
On April 1,1957, the State appropriated an additional 25 acres in a roughly rectangular shape. This appropriation is shown as Parcel No. 2159 on Map No. 2243-R-l, St. Lawrence River Project, St. Lawrence County, and reference is made to Exhibit 3 annexed to the claim herein for a more detailed description. The plot was approximately 350 feet in width and 3,620 feet in depth. Commencing at a point in claimant’s west line approximately 313 feet south of the Middle Road, it extended along the line between claimant and Aluminum Company of America for approximately 2,167 feet and then extended for another approximate 1,700 feet to claimant’s south line, separating a plot containing about 57 acres from the balance of claimant’s land.
This was an appropriation in fee but reserved to the owner the right to utilize the property so far as it did not interfere with any of the purposes of the Power Authority of the State of New York, “ for normal farm purposes, so far as the property might be unused and unoccupied by facilities of the Power Authority ” and including a passageway for ingress and egress located as determined by the Power Authority. The reservation also contained a provision that1 ‘ the rights and privileges hereinabove provided for shall affect the above described property and may be exercised only so long as the property abutting on each side of said property is in the same ownership or is subject *462 to similar rights and privilges as herein reserved Notice of the appropriation was served on April 11, 1957.
On May 1, 1957, there was a further appropriation of claimant’s property. This appropriation included approximately 55.3 acres and is shown as Parcel No. 2169 on Map No. 2235, St. Lawrence River Project, St. Lawrence County, and reference is made to Exhibit 4 annexed to the claim herein for a detailed description of the appropriation.
This parcel was roughly rectangular in shape lying immediately east of the above-mentioned Parcel No. 2159 except that it also included all of claimant’s property lying north of Parcel No. 2159 extending to the Middle Road and at the southerly end it had a kind of triangular toe jutting into claimant’s remaining property. The appropriation included approximately 1,084 feet of claimant’s frontage on Middle Road and extended from Middle Road to claimant’s southerly boundary, a distance of some 3,600 feet.
This permanent easement was for the purpose of ‘ ‘ construcing, reconstructing and maintaining an electrical transmission line, together with appurtenances ”. It reserved to the owner the right of using the property ‘ ‘ providing the exercise of such right and privilege does not, in the opinion of the Power Authority of the State of New York or its assigns, interfere with or prevent the user and exercise of the rights hereinbefore described.”
Claimant asserts that the evidence establishes damage in the amount of $309,000. The State asserts that the evidence establishes damage of between $28,000 and $40,000.
Claimant presented three expert witnesses who placed a value on the property before any appropriations, as of May, 1955, ranging from $331,200 to $368,275. The State argues that the testimony of these witnesses must be entirely disregarded since admittedly, each of them concluded that the commitment of the Federal Government to the project and the actual commencement of construction of the project had resulted in a very substantial increase in value of the land. One of these witnesses testified that a substantial rise in values occurred as early as 1951 when Canada announced that it would develop the Seaway alone if the United States did not care to undertake the development jointly. Another witness testified to a further great upsurge in values in the area in 1954 with the enactment of the Wiley-Dondero Act by Congress creating the Seaway Development Corporation in May of that year (U. S. Code, tit. 33, § 981 et seq.). The State further points out that it was com *463 mitted to the project prior to 1952 by the adoption of section 1005 of the Public Authorities Law.
All of the claimant’s witnesses testified that the highest and best use of the entire tract was for industrial and commercial purposes.
The State’s expert witnesses testified that the highest and best use of the property lying north of Middle Road with the exception of the Middle Road frontage for a depth of approximately 200 feet, was agricultural. The Middle Road frontage was regarded as having a highest and best use for residential development. On the plot south of the Middle Road the State’s experts found the Middle Road frontage and the Denison Road frontage to have a highest and best use for residential purposes and all of the property to the rear having a highest and best use for industrial purposes.
One of the State’s witnesses testified that he could find no increase in values in the general area from 1946 to December 31, 1954 and furthermore that he found no enhancement of the value of this property in 1955,1956 and 1957 due to the project itself.
All of the expert witnesses contend that the valuation presented by each of them respectively was the fair market value of the property as of the date of each of the appropriations based upon a consideration of all of the factors which would have been taken into account by a willing seller and a willing buyer. The State contends that the testimony of claimant’s experts may not be considered since it included increases in value attributable to the project itself and according to the State, under these circumstances such increase in value may not be charged to the sovereign in determination of just compensation.
The State relies principally upon the case of United States v. Miller (317 U. S. 369). In the Miller case one of three possible routes for a railroad relocation had actually been staked out over claimant’s land by March, 1936. This railroad relocation was necessitated by a reclamation project which had been approved by vote of the People of the State of California in 1932. The project was subsequently adopted by the United States as a Federal project and in 1934 the Chief of Engineers of the Army recommended that the Government contribute $12,000,000 toward the project. Congress authorized the appropriation in 1935 and on December 22, 1935 the President approved construction of the entire improvement. In 1936 Congress appropriated $6,900,000 for the project and in 1937 the sum of $12,500,000. In August, 1937 the project was again authorized by Congress.
*464 A complaint in eminent domain was filed on December 14,1938. On the trial each witness was asked to state his opinion as to.market value of the land taken as at December 14, 1938, the date of the filing of the complaint. Government counsel objected to the form of the question on the ground that as the United States was “ definitely committed to the project August 26, 1937 ” the respondents could not have included in an estimate of value any increment of value due to the Government’s authorization of and commitment to the project. The trial court sustained that objection and required the question to be reframed so as to call for market value at the, date of the taking, excluding therefrom any increment of value accruing after August 26,1937 due to the authorization of the project.
On the exception to the specific ruling of the trial court in favor of the Government’s objection the court said (317 U. S. 369, 377, supra): “ The project, from the date of its final and definite authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents’ lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after Augmst 1937 because of the likelihood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation. ’ ’
As a generalization of the applicable rules to the situation before it the court stated (pp. 376-377):
“ If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be take any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
‘1 The question then is whether the respondents ’ lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were *465 merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government’s activities.”
In the Miller case the court cited Shoemaker v. United States (147 U. S. 282), where Congress in 1890 authorized commissioners to establish a park of a fixed acreage within a larger defined and described area. In 1891 the map had been prepared and approved and proceedings were brought to condemn property. The appraisers were instructed that they “ shall receive no evidence tending to prove the prices actually paid on sales of property similar to that included in said park, and so situated as to adjoin it or to be within its immediate vicinity, when such sales have taken place since the passage of the act * * * authorizing said park”. The court in the Shoemaker case approved that instruction.
In applying the Shoemaker case in the Miller case, the court observed (p. 379): “In the Shoemaker case the court excluded any increment of value arising out of the fact that Congress had authorized the location and condemnation of land for the park, for the very reason that Shoemaker’s property lay in the area within which the park was to be laid out. If, in the instant ease, the respondents ’ lands were, at the date of the authorizing Act, clearly within the confines of the project, the respondents were entitled to no enhancement in value due to the fact that their lands would be taken. If they were within the area where they were likely to be taken for the project, but might not be, the owners were not entitled, if they were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable by reason of their proximity to the land taken. In so charging the jury the trial court was correct. ’ ’
Development of power and construction of a St. Lawrence Seaway has been a source of public and private discussion and effort and even a source of litigation for a great many years (Matter of Long Sault Development Co., 212 N. Y. 1). Out of this long history of halting progress toward this project, the State suggests two dates which it claims put a limit on consideration of any additional value arising from the project itself, one in 1952 when notes concerning the development were exchanged between the United States and Canadian Governments *466 and the second May 13, 1954 when the United States Congress authorized and directed the construction of ‘ ‘ deep-water navigation works substantially in accordance with the ‘ Controlled single stage project, 238-242 ’ (with a controlling depth of twenty-seven feet in channels and canals and locks at least eight hundred feet long, eighty feet wide, and thirty feet over the sills), designated as ‘ works solely for navigation ’ in the joint report dated January 3,1941, of the Canadian Temporary Great Lakes-Saint Lawrence Basin Committee and the United States Saint Lawrence Advisory Committee, in the International Rapids section of the Saint Lawrence River together with necessary dredging in the Thousand Islands section” (U. S. Code, tit. 33, § 983, subd. [a]).
Actually, it appears that the State of New York was committed to the project with the adoption of the Power Authority Act contained in chapter 870 of the Laws of 1939 which, as amended, is title 1 of article 5 of the Public Authorities Law. One of claimant’s witnesses testified to an increase in value resulting from the Canadian announcement in December, 1951, that Canada would develop the Seaway alone if the United States did not care to join in the development.
In addition to the problem of time involved in the application of the Miller ride to the instant ease, there is also a problem of location. In both the Miller and Shoemaker cases (supra) there was at least an open and notorious designation of an area within which the development would probably occur. The record here is bereft of any such evidence. Apparently the State believes that the Miller rule applies to any appropriation actually made for the purposes of the Power Authority. We do not believe that the application of.the Miller rule is quite so broad, and that an open and notorious designation of the probable area of condemnation is necessary before the rule can be applicable. This could not have occurred prior to the adoption of section 983 of title 33 of the United States Code on May 13, 1954.
In relation to the St. Lawrence Seaway Project, however, it has been indicated that there must be some proof of location one way or the other before the court, and, where there is no proof, the claimant fails to sustain his burden of proof as to that element of damage (Fitzgerald v. State of New York, 9 A D 2d 486).
In regard to the first taking on May 19, 1955, of claimant’s approximately 183 acres lying north of the Middle Road, the record is bereft of any evidence having probative value as to whether or not the property probably would be condemned for the project.' Under these circumstances the court may not *467 include any increment of value resulting from the project itself. This means that the conclusions of the claimant’s experts as to the damage resulting from this appropriation may not be considered. So far as these experts, however, testified to factual observations and their conclusions as to the state of the economy and other factors concerning value, their testimony is completely admissible even under the Miller rule.
In spite of the conflicting conclusions as to value of the experts which on the part of claimant’s experts, are inadmissible, certain areas of agreement do emerge. Even before the actual construction of the Seaway or the final irrevocable commitment to that construction, the economy of St. Lawrence County was shifting, with agriculture principally in the form of dairy farming becoming less important and industrial and commercial activities becoming more important. The center of industrial and commercial activity was the Village of Massena and this property was immediately adjacent to the principal industrial plants in the area. "While claimant’s land lying south of Middle Road was zoned industrial and the appropriated plot lying north of Middle Road was zoned agricultural, there was physically no essential difference between the two plots and from a physical and location aspect the property north of Middle Road was as readily available for industrial use as the property south of Middle Road. All of the experts agree that there was no consequential damage to the remainder of the plot by reason of the appropriation of the land north of Middle Road.
In arriving at the damage to the claimant by reason of this appropriation of May 19, 1955, the court cannot consider sales such as the acquisition of land by the Reynold Aluminum Company and General Motors since these acquisitions clearly reflected an enhancement resulting from the improvement itself with the location of the property on the deepwater pool and commitments for electric power. On all of the evidence the court finds that the highest and best use of this property was for industrial purposes although the value must reflect the fact that it was presently zoned for agricultural use (Valley Stream Lawns v. State of New York, 9 A D 2d 149). The court finds that the fair market value of this property as of the date of appropriation without any enhancement by reason of the commitment of the Government to the project was $32,000 and the claimant is entitled to an award in that amount with interest thereon from May 19,1955 to November 19,1955, and from June 25,1957 to the date of entry of judgment.
The later appropriations fall in a different category in regard to the application of the Miller case rule (supra). The time of *468 the appropriations themselves and the construction of the dike on the first parcel appropriated strongly indicate that claimant’s land fell within the category of adjacent land not included within the original limits of the project. It appears that the agreement to furnish electric power to the Aluminum Company of America was subsequent to the original appropriation and yet distribution to that company appears to be the major purpose of the subsequent appropriations other than the very small appropriation for flooding. In its report for the year ended December 31, 1954 the Power Authority pointed out “ although the authority has the right to build transmission lines, it does not propose to exercise it unless it cannot proceed promptly, adequately and equitably to distribute power to the facilities of existing utility facilities.” On this record the evidence establishes that claimant’s land lying south of Middle Road did not fall within the category of lands ‘1 probably to be taken for public use ’ ’, and, therefore, the subsequent appropriations required that the condemnor ‘1 pay their market value as enhanced by this factor of proximity” (United States v. Miller, 317 U. S. 369, 376, 377, supra).
The first of these appropriations (Parcel No. 2202) involved only .15 acres and was a permanent easement for flooding covering property lying entirely within an area already subject to a drainage easement in favor of the Aluminum Company of America. The witnesses were not in serious disagreement as to the value of this appropriation and the court finds that for this appropriation the claimant is entitled to an award in the amount of $100 with interest thereon from June 12, 1956 to December 12, 1956, and from June 25, 1957 to the date of entry of judgment.
The third appropriation (Parcel No. 2159) included 25.34 acres and separated the southwesterly portion of claimant’s land from the balance of the property with the only access being that reserved to the claimant in the appropriation, which was a passageway for ingress and egress located as determined by the Power Authority. This reservation was also included with a reservation of use for normal farm purposes. This reservation, limited to farm purposes and having other conditions in it, exists in the light of the testimony of all the expert witnesses that this portion of claimant’s property including that segregated from the rest, had a highest and best use for industrial purposes. On this record the reservation of the right of use and ingress and egress was of only nominal value and the southwesterly portion of claimant’s property separated from the balance of the prop *469 erty was reduced by about 95 fd of its prior value as testified to by the State’s expert.
The court finds that the fair market value of claimant’s property lying south of Middle Road at the time of the appropriation of 25.34 acres was $88,500. The court finds that after the appropriation the value of claimant’s property was $48,750. Claimant is entitled to an award for this appropriation in the amount of $39,750, made up of direct damage for the taking of 25.34 acres in the amount of $12,675 and consequential damage to the claimant’s property lying west of the taking in the amount of $27,075, with interest thereon from April 1, 1957 to the date of entry of judgment. The court finds that there was no consequential damage by reason of this taking to claimant’s property lying east and north of the parcel appropriated.
The last appropriation (Parcel No. 2169) was an easement for electric transmission lines over a parcel containing 55.38 acres described above. Under the terms of the easement appropriated the claimant had a right of use so long as that use did not interfere with the use by the Power Authority. It is difficult to conceive just what market value this property could have after the appropriation, in the light of the testimony of claimant’s witnesses that the highest and best use was for industrial for the entire plot and the testimony of the State’s witnesses that the highest and best use was industrial except for the frontage on Middle Road which they found to have a highest and best use for residential purposes. The court is forced to find on the evidence before it that the taking destroyed any market value for the interest remaining in the claimant in this 55.38 acres. The court finds that the claimant is entitled to an award for this taking in the amount of $27,700 with interest thereon from May 1, 1957 to the date of entry of judgment. The court finds that there was no consequential damage to claimant’s remaining property by reason of this appropriation.
Summarizing the awards, the court finds that the claimant is entitled to judgment for (a) $32,000 for the appropriation of Parcels Nos. 185 and 148 shown on Map 108, with interest thereon from May 19, 1955 to November 19, 1955 and from June 25, 1957 to the date of entry of judgment; and (b) $100 for the appropriation of Parcel No. 2202 shown on Map 2212, with interest thereon from June 12, 1956 to December 12, 1956 and from June 25, 1957 to the date of entry of judgment; and (c) $39,750 for the appropriation of Parcel No. 2159 shown on Map No. 2243-R-l, with interest thereon from April 1, 1957 to the date of entry of judgment; and (d) $27,700 for the appro *470 priation of Parcel No. 2169 shown on Map No. 2235, with interest thereon from May 1, 1957 to the date of entry of judgment.
Findings and conclusions submitted by the parties have been marked and signed and constitute a part of this decision.
The claim has not been assigned. The court has viewed the premises.
The foregoing constitutes the written and signed decision of the court upon which judgment may be entered (Civ. Prac. Act, § 440).